823 A.2d 696

**Kenneth Kurt BEHREL**

v.

**STATE of Maryland.**

Nos. 00750, 00751, Sept. Term, 2002.

Court of Special Appeals of Maryland.

May 7, 2003.

26.

70

74

Gregory C. Bannon (Bannon & Balon, on brief), Hagerstown, for appellant.

Zoe Gillen White, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., HOLLANDER and RAYMOND G. THIEME, JR., (Retired, Specially Assigned), JJ.

HOLLANDER, J.

Kenneth Kurt Behrel, appellant, a former Episcopal pastor,[1] was convicted in the Circuit Court for Washington County of sexually abusing Matthew Curtis (the "Curtis trial"), and, at a separate trial, of sexually abusing Jeffrey Miller (the "Miller trial"). The court sentenced appellant to two consecutive twelve-year terms of imprisonment for his violations of Md. Code (1957, 1996 Repl. Vol.), Art. 27, § 35C. This consolidated appeal followed.[2]

From 1980 to 1985, appellant, then in his 30's, served as the chaplain, a teacher, and a "Hall Master" at Saint James School ("SJS" or the "School"), an Episcopal boarding school near Hagerstown. In 1985, he moved to Illinois, where he served as rector of Saint Andrew's Parish until February 5, 2001. The victims, Miller and Curtis, were high school boarding students at SJS during appellant's tenure as chaplain.

As to both trials, appellant asks us to consider whether the circuit court erred in denying his motion to suppress evidence seized from his residence in Illinois pursuant to a search warrant. The warrant was issued about sixteen years after the alleged crimes occurred, and the search pertained to appellant's residence in Illinois, a location unrelated to the place of the alleged offenses. Therefore, appellant claims the search warrant was founded on stale information rather than probable cause. In addition, we are asked to resolve whether

1. Appellant has two master's degrees, including a "Master of Divinity" from a seminary in Wisconsin. Throughout the record, appellant is referred to as "Father Behrel" or as a "priest." For the most part, appellant referred to himself as a "pastor" or a "rector."

2. Following a hearing in August 2001, the circuit court granted the State's motion to consolidate the cases for trial. Then, in November 2001, the circuit court, *sua sponte*, bifurcated the cases. By Order of October 16, 2002, we granted appellant's motion to consolidate the appeals.

the court below erroneously admitted "other crimes" evidence at the Curtis trial by allowing Miller to testify to appellant's abuse of him. Finally, we must determine whether the trial court abused its discretion at the Miller trial by denying appellant's motion for mistrial after Miller alluded to appellant's abuse of others.

Behrel frames three questions for our review, which we have reformulated slightly:

I. With respect to both trials, did the circuit court err in denying appellant's motion to suppress evidence recovered during the execution of the search warrant issued for appellant's residence in Illinois?

II. Did the trial court err in admitting "other crimes" evidence at the Curtis trial?

III. Did the trial court err in denying appellant's motion for mistrial in the Miller trial?

For the reasons that follow, we shall affirm appellant's conviction in the Miller trial, vacate appellant's conviction in the Curtis trial, and remand that case for further proceedings.

## I. THE MOTIONS TO SUPPRESS

### A. Factual Summary

On December 11, 2000, Behrel was charged with the sexual child abuse of both Curtis and Miller. Following appellant's indictments, the Maryland State Police contacted the authorities in Illinois, to obtain and execute a search warrant for 302 Buckingham Drive in Grayslake, Illinois, where appellant then resided. Louis Archbold, a special investigator with the Lake County prosecutor's office, was assigned to the matter. An Illinois search warrant was issued on February 2, 2001, and executed by the Grayslake, Illinois Police Department on February 5, 2001, in the presence of Trooper First Class ("TFC") Michael Potter of the Maryland State Police. During the search, the police seized a footlocker that matched the description of a trunk provided by Curtis and Miller. Pornographic materials found inside the footlocker were also seized.

Claiming that the information supporting the warrant was stale, appellant moved in both cases to suppress the footlocker and the pornographic materials. He argued that the warrant did not establish probable cause, because the events described in the affidavit occurred some sixteen years earlier and in another state. At the joint hearing held on August 13, 2001, Potter testified for the State; appellant did not present any witnesses.[*] What follows is a summary of the evidence adduced at the hearing.

The investigation of appellant began on April 10, 1998, when Curtis reported to the Flathead County, Montana Sheriff's Department that, from 1983 to 1985, while he was a high school student at SJS, appellant repeatedly subjected him to sexual abuse. During a recorded interview, Curtis claimed that the abuse began with fondling and progressed to oral sex and sodomy in appellant's SJS campus apartment. In addition, Curtis reported that appellant had sodomized another student named Jeff Miller. Further, Curtis disclosed that appellant stored pornographic material and sexual aids in a footlocker that he used as a coffee table in his campus apartment. Curtis's complaint and interview were forwarded to the Maryland State Police for further investigation. After the matter was assigned to Potter, he met with Curtis. According to Potter, Curtis reiterated the claims that he had made to the Montana Sheriff's Department, including the information regarding appellant's sexual activities with Miller.

Potter also stated that Miller was located in Alexandria, Virginia about six to nine months later. He obtained a formal statement from Miller on June 29, 2000. Miller told Potter that, while he was a student at SJS from 1981 to 1984, he was sexually abused by appellant in appellant's campus apartment. According to Miller, the abuse progressed from fondling to fellatio and sodomy. Further, Miller recalled that appellant had a "foot locker" that he "used as a coffee table ...," in which appellant stored photographs that he took of Miller "in sexual positions against [his] will." Although Miller acknowledged that he knew of Curtis, he claimed he had "no real dealings with him," and the two were not friends.

On cross-examination, Potter admitted that the alleged abuses occurred in Maryland; there were no allegations that any of the offenses had occurred at appellant's residence in Illinois. Moreover, Potter acknowledged that the abuse had occurred some fifteen to twenty years prior to the execution of the warrant. Potter also conceded that he had no "direct evidence" of anything in appellant's residence in 2001 that would constitute evidence of the alleged offenses.

The Complaint for Search Warrant ("the Complaint") was admitted in evidence, along with the supporting affidavit executed by Archbold. The items sought in the search included:

> [A] footlocker and/or storage trunk, photographs and videos depicting child pornography, inhalants (i.e.: "Rush"), written correspondence, computers, computer hardware, computer disks, and all items related to the offenses of criminal sexual assault, aggravated criminal sexual assault, criminal sexual abuse and aggravated criminal sexual abuse and child pornography.

In his affidavit, Archbold relied entirely on information provided to him by Potter. Because the content of the affidavit is central to the issue of staleness, we quote from it at length:

> Your affiant states that he was contacted by Trooper First Class, Michael Shane Potter, a member of the Maryland State Police, regarding Father Kenneth K. Behrel of St. Andrew Parish in Grayslake. Trooper Potter has been with the Maryland State Police for 27 years. He completed the Maryland State Police Academy and is certified as a police officer in the State of Maryland. Trooper Potter has an Associates [sic] Degree in Administration of Justice from Hagerstown Junior College and a Bachelor of Science Degree in Criminal Justice from the University of Baltimore. In addition Trooper Potter has attended numerous training courses including courses dealing with child abuse, crimes against persons and child pornography. Trooper Potter has been assigned to criminal investigations for the past twelve (12) years. During Trooper Potter['s]

*police career he has been involved in the execution of 40 search and seizure warrants in Washington County, Maryland. Trooper Potter has investigated and assisted in over 300 crimes involving child abuse and sexual offenses. Trooper Potter has also attended in-service schools with the Maryland State Police, seminars and other classes dealing with child abuse and sexual offenses.* **Trooper Potter has learned through his training that sexual offenders tend to keep mementoes of prior acts along with pictures and videos.**

*Your affiant states that Trooper Potter related the following facts regarding Father Kenneth K. Behrel; [sic] On April 10, 1998, victim Matthew Curtis made a complaint to investigators at the Flathead County, Montana Sheriff's Department that he had been the victim of sexual assaults in Washington County, Maryland. A recorded statement of the victim was taken and forwarded to the Hagerstown Barracks of the Maryland State Police. In his statement, the victim alleged that he lived on campus as a student at St. James School. He attended classes at the school between September 1982 and June 1986. The victim said the sexual abuse by Father Kenneth Behrel, a priest who lived in the apartment on campus, began around January or February 1983. The last sexual encounter between Behrel [and Curtis] was sometime in 1985. As the school priest and instructor at the school, Behrel was responsible for the care and supervision of the students, including the victim. The abuse began with Behrel fondling the victim's penis. The abuse always occurred in Behrel's campus apartment. The abuse progressed to Behrel performing oral sex on the victim, the victim performing oral sex on Behrel, and Behrel performing sodomy on the victim. On many occasions, Behrel masturbated the victim and on at least one occasion the victim masturbated Behrel. During these sexual encounters, **Behrel would get a pornographic video movie from a footlocker that he used as a coffee table stand in his apartment. This footlocker was kept locked by Behrel [and] also contained lubricant he used just prior***

to sodomizing the victim. **The footlocker also contained pornographic magazines.** During these sexual encounters, Behrel told the victim that he had also sodomized another student at the school and he identified that student as "Jeff" Miller. The victim did not know Miller personally but knew of him. Miller was two years ahead of him at the school. The victim has never talked to Miller about any topic including the allegations of abuse.

**A check of school records at St. James School revealed that both victims, Curtis and Miller, had attended school there during the tenure of Father Behrel. Records indicated that Behrel had been a priest at the school between September 1980 and June 1985. Both victims were involved in a select group of males assigned to Behrel for training in religious functions at the school such as sacristans.**

Victim Jeffrey Miller was located living in Alexandria, Virginia in the Spring of 1999. He was reluctant to be interviewed because he was now married and had a family. After several months, Miller consented to be interviewed. He said he was a student at St. James School between September 1981 and May 1984. He was a live on campus student. Miller said that he became acquainted with Father Behrel from his participation in religious functions at the school beginning as a[n] acolyte. Behrel allowed him to come to his campus apartment and watch television in the evenings because of his association in religious functions. In 1982, Miller found himself being treated "special" by Behrel and was allowed to watch television alone after hours in Behrel's apartment. Behrel began giving him back massages under his clothing. Behrel also gave alcoholic beverages to Miller during this time. These massages progressed until Behrel was massaging his genital area. During this time, Behrel fondled Miller's penis. The events escalated over a short period of time to Behrel taking off Miller's clothes, masturbating him, and performing oral sex on him. The sexual abuse continued during the remaining years that Miller attended the school with Miller

*always told to come to Behrel's apartment one day a week. During that time, Behrel would engage in sexual activity with Miller. The activity escalated to include Behrel performing sodomy on Miller.* **During the sexual activity, Behrel would show Miller pornographic movies which he obtained from a footlocker that he used as a coffee table in his apartment. He also obtained a lubricant from the same locker. During the sexual activity, Behrel also took photographs of Miller. Some of the photographs were of Miller nude and others were taken as Behrel was performing sodomy on Miller,** *taking a picture of the sexual act.* **The photographs were kept in a stack held by a rubber-band and kept in the footlocker which was always locked and Behrel had the key.** *Miller also took several trips with Behrel during his time as a student at St. James including trips to Chicago, Illinois and Michigan. During these trips, Behrel also engaged in sexual activity with Miller to include oral sex and sodomy at various locations in various states. Trooper Potter advised your affiant that an indictment has been issued in Maryland for Kenneth K. Behrel for the above listed offenses.*

(Boldface added; italics in original).

Urging the court to suppress the evidence, appellant's attorney said:

All we have in the complaint for a search warrant is Trooper Potter's belief that some sexual offenders sometimes keep mementoes. I submit that that is not sufficient probable cause. The cases cited by the State for longer periods than say eleven months ... involve business records and where people have gone to see those business records or see file cabinets in the person's home shortly before the affidavit.

I would submit, [Y]our Honor, that if probable cause is found in this case, probable cause can be found in any case by someone merely submitting [sic]. I know of no on-going activity than the incisive nature of drug trafficking. And I submit that it would be more than reasonable for an officer to state that, "It's my experience that a previous drug

offender ... unless he gets treatment will continue in drug trafficking and probably would have something in their apartment."

\* \* \*

[W]e don't even have a search of the residence at Saint James. *We have a search of a residence after someone has moved and I don't agree with [the Prosecution] that twenty years later we may have the same furniture after moving on different occasions. You might. You might not.*

*But more importantly, it wasn't furniture they were looking for.* But ... and ironically no mementoes of Mr. Curtis or Mr. Miller were found in the search. There were no such photographs or mementoes found of them. But nevertheless the State, I assume, wishes to bring in these items to argue that the defendant is a bad person and leads a contrary lifestyle than most of us would.

But in any event, I believe there is simply [a] lack of probable cause in the warrant. I don't believe the magistrate should have issued it. . . .

(Emphasis added).

The State countered that, as to the footlocker and its contents, the information was not rendered stale by the passage of time. It argued:

[U]nlike drugs or lottery tickets, which may be contraband per se[,] this trunk is not contraband per se. *It's an item of furniture. And it's not unreasonable to believe that this item of furniture that [appellant] had while he was in Saint James School is an item of furniture that he would continue to keep throughout his life. And so while this may be a significant number of years after the fact, I would ask the court to consider the special character of the piece* . . . of the item that was sought and to look at that item not as contraband per se but *as furniture and something that the defendant would hang on to, which in fact, we know that he did.*

\* \* \*

Your Honor.... As we know ... the police are encouraged to seek search warrants. And so did the magistrate, did the issuing judge in Illinois have a substantial basis for issuing the search warrant that he did? And I would submit to the Court that he did.

Evaporation of probable cause may well occur with a drug case, with lottery tickets but here it is an on-going item ... or it is an item which he continues to have in his presence. *It's furniture and it has a special character that these other items don't have.* And so, I submit to the Court that there was in fact probable cause to issue this search warrant for this property.

(Emphasis added).

Concluding that "[p]robable cause was not stale," the court denied the suppression motion.[3] It reasoned:

Well I have read both of the interviews that form the basis of the statement of probable cause upon which the search warrant was issued in Illinois. Just as a matter of reference, Page 6 of the interview with Curtis... *Mr. Curtis talks first about the footlocker.* [Curtis said:] "*I remember another specific incident when he had a footlocker at the base of his couch and it had a lock on it.* Inside was the porno magazines and a porno tape ..."

\* \* \*

And *in the statement of Jeffrey [Miller] it first talks about the locker* on Page 4.

"*I recall furniture as a footlocker, ah which was used as a coffee table to the sofa,* which in fact was laying on that particular sofa at the time and it certainly had some things in it which we will later come across."

---

3. Appellant observes in his brief that the trial judge considered information outside "the four corners" of the affidavit. Nevertheless, he does not challenge the court's ruling on that basis. In any event, Potter's testimony was consistent with the information in Archbold's affidavit.

He then goes on to graphically describe the activities. He talks about photographs, Page 10. The type photos he was talking about, "Were they Polaroid photos?

Yes they were.

So you could see them immediately after it was done. Did he show them to you?["]

\* \* \*

Jeffrey's answer, "I don't know if they were in an album but he would . . . bundle . . . them together and *I recall seeing that in his footlocker* that I told you about acted as a coffee table in his apartment. . . .

It was a black footlocker, kind of a dark with some beading, a standard kind of footlocker. . . ."

That was part of the information that became the statement of probable cause to believe that there was evidence of crime, evidence of methodology, evidence of instruments, specifically the footlocker. The complaint for the search warrant was not general in nature. It requests the search warrant for the purpose of seizing the following described instruments, articles and things: *a footlocker and/or storage trunk*, photographs and videos depicting child pornography, inhalants—i.e. rush, written correspondence, computers, etcetera that would be relating to the offenses of sexual abuse, criminal sexual abuse, aggravated criminal sexual abuse, child pornography.

(Emphasis added).

## B. Discussion

### 1. Probable Cause

■ Appellant contends that the court erred in failing to suppress the footlocker and its contents, claiming "that there was no probable cause to believe that the defendant's home in [Illinois in] 2001 contained evidence of alleged offenses which occurred in another state some 15–20 years earlier." According to appellant, "the search was so far removed from the date of the alleged crimes some fifteen years earlier that any

warrant would have been defective as a result of this staleness."

The State counters:

Given [the] allegations of sexual misconduct and of storing pornography, sexual aids and explicit photographs of one of the victims, in conjunction with the averment of Trooper Potter's knowledge that "sexual offenders tend to keep mementoes of prior acts along with pictures and videos," the judge's decision to issue the warrant was supported by a substantial basis to believe that evidence would be found at Behrel's apartment in Grayslake, Illinois.[4]

The Fourth Amendment of the United States Constitution proscribes the issuance of any warrant "but upon probable cause, supported by Oath and affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. CONST. AMEND. IV. To be sure, "[a] judicially authorized warrant is the cornerstone of the Fourth Amendment...." *Wiegmann v. State*, 118 Md.App. 317, 347, 702 A.2d 928 (1997), *aff'd*, 350 Md. 585, 714 A.2d 841 (1998); *see also Braxton v. State*, 123 Md.App. 599, 619, 720 A.2d 27 (1998). "Article 26 of the Maryland Constitution is *in pari materia* with the fourth amendment." *Birchead v. State*, 317 Md. 691, 700, 566 A.2d 488 (1989); *see Scott v. State*, 366 Md. 121, 139, 782 A.2d 862, *cert. denied*, 535 U.S. 940, 122

---

4. We discuss the State's good faith argument, *infra*. A reviewing court has discretion to decide the good faith issue without first resolving whether the warrant was supported by probable cause. *See United States v. Leon*, 468 U.S. 897, 924–25, 104 S.Ct. 3405 (1984); *McDonald v. State*, 347 Md. 452, 469, 701 A.2d 675 (1997), *cert. denied*, 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998); *Braxton v. State*, 123 Md.App. 599, 618 n. 7, 720 A.2d 27 (1998). Nevertheless, when a suppression motion presents a Fourth Amendment issue involving a "novel question of law whose resolution is necessary to guide future action by law enforcement officers" and judges, it is appropriate for the reviewing court to resolve the probable cause issue. *Illinois v. Gates*, 462 U.S. 213, 264, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (White, J., concurring); *see McDonald*, 347 Md. at 475–76, 701 A.2d 675 (Chasanow, J., dissenting); *Braxton*, 123 Md.App. at 618 n. 7, 720 A.2d 27.

S.Ct. 1324, 152 L.Ed.2d 231 (2002); *Muse v. State,* 146 Md. App. 395, 402 n. 7, 807 A.2d 113 (2002).

Accordingly, before conducting a search, the police ordinarily must obtain a search warrant based upon " ' "sufficient probable cause to justify its issuance as to each person or place named therein." ' " *State v. Ward,* 350 Md. 372, 387, 712 A.2d 534 (1998) (citations omitted); *see Connelly v. State,* 322 Md. 719, 726, 589 A.2d 958 (1991). Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see Williams v. State,* 372 Md. 386, 420, 813 A.2d 231 (2002); *Holmes v. State,* 368 Md. 506, 519, 796 A.2d 90 (2002); *West v. State,* 137 Md.App. 314, 321, 768 A.2d 150, *cert. denied,* 364 Md. 536, 774 A.2d 409 (2001).

In the seminal case of *Illinois v. Gates, supra,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, the Supreme Court reiterated that "the central teaching of [its] decisions bearing on the probable-cause standard is that it is a 'practical, nontechnical conception.' " *Id.* at 231, 103 S.Ct. 2317 (citation omitted). Thus, the issuing judge makes

> a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at 238, 103 S.Ct. 2317. *See also United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (noting that a "grudging" attitude on review will "discourage police officers from submitting their evidence to a judicial officer before acting"; recognizing that "affidavits for search warrants ... must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion").

Adhering to the same practical approach, the Court of Appeals has advised that, in

reviewing affidavits on a probable cause determination, "when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."

*Valdez v. State,* 300 Md. 160, 169, 476 A.2d 1162 (1984) (citations omitted).

In determining whether a warrant is supported by probable cause, "the issuing judge is confined to the averments contained in the search warrant application." *Birchead,* 317 Md. at 700, 566 A.2d 488; *see State v. Coley,* 145 Md.App. 502, 520, 805 A.2d 1186 (2002). However, wholly conclusory statements in a warrant application ordinarily will not suffice. *See Gates,* 462 U.S. at 239, 103 S.Ct. 2317. Nor is the issuing judge a mere " 'rubber stamp for the police.' " *Grimm v. State,* 7 Md.App. 491, 493, 256 A.2d 333 (1969) (citation omitted); *see Braxton,* 123 Md.App. at 622, 720 A.2d 27. Nevertheless, to effectuate the preference for warrants, deference is accorded to the issuing judge's determination. *See Gates,* 462 U.S. at 236, 103 S.Ct. 2317; *McDonald v. State,* 347 Md. 452, 467, 701 A.2d 675 (1997), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998); *State v. Riley,* 147 Md.App. 113, 119–120, 807 A.2d 797 (2002).

On the other hand, there are "limits beyond which a magistrate may not venture in issuing a warrant," *Gates,* 462 U.S. at 239, 103 S.Ct. 2317, and "[d]eference ... is not boundless." *Leon,* 468 U.S. at 914, 104 S.Ct. 3405. This means that a reviewing court must determine if the issuing judge had "a substantial basis for concluding that the evidence sought would be discovered in the place described in the application and its affidavit." *State v. Lee,* 330 Md. 320, 326, 624 A.2d 492 (1993); *see Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (reiterating that "the task of a reviewing court is not to conduct a *de novo*

determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant"); *see also Williams,* 372 Md. at 420, 813 A.2d 231; *Ward,* 350 Md. at 398, 712 A.2d 534; *McDonald,* 347 Md. at 467, 701 A.2d 675.

Maryland Code Ann. (1957, 1996 Repl.Vol.), Art. 27, § 551(a), is also relevant [5]; it provides that a judge may issue a search warrant if the supporting affidavit demonstrates probable cause. But, the search warrant must "describe, with reasonable particularity, . . . the grounds" to search a particular place. *Id.; see also Braxton,* 123 Md.App. at 622, 720 A.2d 27.

■■■ One of the factors in the "probable cause puzzle" concerns the staleness of the information contained in an affidavit supporting a search warrant application. *West,* 137 Md.App. at 327–28, 768 A.2d 150. "[I]f the facts set out in the affidavit were indeed 'stale' at the time the warrant was issued, the affiant would not have had reasonable grounds" to believe that the object of the search would be found "on the premises to be searched." *Id.* at 346, 768 A.2d 150. The Court explained in *Peterson v. State,* 281 Md. 309, 314, 379 A.2d 164 (1977), *cert. denied,* 435 U.S. 945, 98 S.Ct. 1528, 55 L.Ed.2d 542 (1978):

> "The affidavit for a search warrant on probable cause, based on information and belief, should in some manner, by averment of date or otherwise, show that the event or circumstance constituting probable cause, occurred at the time not so remote from the date of the affidavit as to render it improbable that the alleged violation of law authorizing the search was extant at the time the application for the search warrant was made."

(Citation omitted).

Staleness, however, is not a rigid concept; it depends on the particular circumstances of the case. In his treatise discuss-

---

5. The parties have not addressed the question of whether Maryland or Illinois law applies with regard to the issuance of the warrant, presumably because they rely on federal constitutional law.

ing search and seizure law, LaFave noted that " 'a highly incriminating or consumable item of personal property is less likely to remain in one place as long as an item of property which is not consumable or which is innocuous in itself or not particularly incriminating.' " 2 LaFave, Search and Seizure § 3.7(a), at 348 (3d ed. 1996) ("LaFave") (quoting *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir.1975)).

We find further guidance in *Andresen v. State*, 24 Md.App. 128, 172, 331 A.2d 78 (1975), *aff'd.*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). Judge Moylan, for the Court, explained:

> The ultimate criterion in determining the degree of evaporation of probable cause, however, is not case law but reason. *The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock:* the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), *of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?)*, of the place to be searched (mere criminal forum of convenience or secure operational base?), etc. The observation of a half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in; the observation of the burial of a corpse in a cellar may well not be stale three decades later. The hare and the tortoise do not disappear at the same rate of speed.

(Emphasis added).

*West*, 137 Md.App. at 347–48, 768 A.2d 150, is also instructive. Writing for the Court, Judge Thieme said:

> In *Clayton v. State*, 1 Md.App. 500, 503, 231 A.2d 717 (1967), we stated: "There is no statute in this State providing that the facts in the application, set forth to establish probable cause, must result from observations made within a designated time before the issuance of the warrant." We noted that "the remoteness of the facts observed from the date of issuance of the warrant is an element to be consid-

ered in each instance by the issuing authority in his determination ... of whether it appears that there is probable cause." *Id.*

\* \* \*

*There is no "bright-line" rule for determining the "staleness" of probable cause; rather, it depends upon the circumstances of each case, as related in the affidavit for the warrant. See, e.g., United States v. Hernandez–Escarsega,* 886 F.2d 1560 (9th Cir.1989) (probable cause not stale when last event occurred almost one year before the warrant issued, but there was evidence of protracted criminal activity); *United States v. Craig,* 861 F.2d 818 (5th Cir.1988) (when affidavit described criminal activity of long standing, information need not be regarded as stale even if fairly long periods of time have elapsed between information and the issuance of the warrant).

(Emphasis added).

 In analyzing the issue of staleness, "the expertise and experience of the officer are to be taken into account in applying the Fourth Amendment probable cause test", even if "the officer would not qualify as an expert witness on the subject." 2 LaFave, § 3.2(c), at 38–39, 38 n. 70 (citing *United States v. Ortiz,* 422 U.S. 891, 897, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975) (holding that "officers are entitled to draw reasonable inferences from the[ ] facts in light of their knowledge of the area and their prior experience...."); *United States v. Brignoni–Ponce,* 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (concluding that "the officer is entitled to assess the facts in light of his experience...."); and *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("[D]ue weight must be given ... to the specific reasonable inferences which [the police officer] is entitled to draw from the facts in light of his experience.")).

Here, the search warrant issued in February 2001 pertained to events that occurred, at the latest, in 1985. Moreover, the warrant involved a search in Illinois, not Maryland. But, contrary to appellant's suggestion, the mere passage of time

and change of residence are not dispositive, because "[t]he likelihood that the evidence sought is still in place is a function not simply of watch and calendar...." *Andresen,* 24 Md.App. at 172, 331 A.2d 78.

Although we have not uncovered any Maryland cases addressing the issue of staleness in the context of the circumstances attendant here, other jurisdictions have done so. The State refers us to *State v. Kirsch,* 139 N.H. 647, 662 A.2d 937 (1995), to support its contention that probable cause was not defeated by the passage of time or appellant's change of residence.

In *Kirsch,* the defendant was the leader of pre-teen groups at his church; he was suspected of sexually assaulting several children between 1978 and 1987. *Id.* at 939. In 1990, the police obtained a warrant to search the defendant's home, based on interviews of two victims. During the search, the police seized pornographic materials and school photographs of various children, including some of the victims. *Id.* The defendant unsuccessfully moved to suppress the evidence and was convicted. On appeal, he argued "that the warrant was not supported by probable cause in that it was based on stale information," because the most recent alleged incident of abuse occurred six years prior to the warrant application. *Id.* at 940.

In assessing whether there was "a substantial likelihood that contraband or evidence of crime will be found in the place to be searched", the New Hampshire Supreme Court upheld the finding of probable cause. Relying on cases from other states, it found "that an appreciable lapse of time was no bar to a finding of probable cause to issue a search warrant, in light of the nature of the offense and of the items sought." *Id.* The court stated:

> Here, the affidavit recounted sexual abuse of children over a period of six years. During that period the [appellant] photographed the children and displayed pornographic movies during some of the assaults.... A "common-sense inference" about the longevity of child pornography for the

sexual abuse of children may reasonably be drawn from the nature of the items themselves, such as the photographs taken of the children. "Photographs guarantee that there will always be an image of the child at the age of sexual preference...."

*Id.* at 940–41 (internal citations omitted). Accordingly, the court determined that "it [was] reasonable for a magistrate to conclude that all the items sought were reasonably connected to the suspected criminal activity and likely to have been retained by the defendant." *Id.* at 941.

*People v. Russo,* 439 Mich. 584, 487 N.W.2d 698 (1992), cited in *Kirsch,* is also instructive. There, the Michigan Supreme Court reversed the lower court's finding that "the passage of time negated an inference of probable cause" in connection with a search warrant issued for the defendant's home more than six years after the last alleged incident of sexual abuse had occurred at that location. *Id.* at 700, 704. Finding probable cause, the appellate court stated, *id.* at 710–11, 711:

[U]nlike the possession of contraband or the situation in which the criminal activity incidentally and sometimes unwittingly creates evidence of crime, where the reasonable inference is that a person will get rid of incriminating evidence, the case at bar involves a situation in which the individual intentionally created evidence of his criminal activity and displayed it over the course of years. Moreover, the evidence was not simply created and used, it was stored with a degree of care indicative of its continuing value to the defendant.

Finally, it is possible to infer that the items might have ceased to have value for the defendant when his molestation of the victim ceased. But just as the possibility that there was an innocent explanation for the behavior of the defendants in *Gates* did not negate the majority's finding that there was a fair probability that they were engaged in criminal activity,[ ] we think that the magistrate here could conclude that there was a "fair probability" of the presence

of evidence which had sexual, historical, and perhaps even sentimental, significance for its possessor and creator.

\* \* \*

We hold only that where suspicion of criminal activity has focused on a specific individual by a standard more probable than not, and it is alleged that the evidence sought was created, retained, and employed in ongoing criminal activity over a four-year period, the magistrate could reasonably conclude that there was a "fair probability" that the evidence would be retained in the residence of the accused.

The Supreme Court of Iowa's decision in *State v. Woodcock*, 407 N.W.2d 603 (Iowa 1987), is also illuminating. The defendant challenged his third-degree sexual abuse convictions, claiming that the court erred in admitting evidence obtained from his home during the execution of a search warrant. *Id.* at 603. The defendant argued that the search was not based on probable cause because the underlying information was stale, in that it was more than a year old. *Id.* at 604.

The supporting affidavit stated, in part, 407 N.W.2d at 605:

Your affiant has had conversations with [a] Special Investigator ... who has received training in the area of child Sexual Exploitation and pedophiles and [he] and your affiant both have received training that indicates that pedophiles and others who sexually exploit children by taking erotic photographs are inclined to not destroy such photographs but to save them for future use and gratification and that such individuals maintain lists by way of documents and computer lists of children they are sexually active with including the names, ages, addresses and birth dates of such children.

Rejecting the defense's contention, the Iowa court said:

[T]he nature of the offense is a factor bearing on a claim of staleness, and it would be reasonable for an issuing magistrate to conclude that a person charged with sexual exploitation of children through photographs and similar

items would be likely to retain them for an indefinite period of time.

\* \* \*

Thus, in contrast to theft or robbery cases where the evidence would be expected to be moved fairly rapidly, and in contrast to drug cases where the evidence would likely have been sold or consumed in a year and a half, the types of material involved here would be more likely to be retained. Their perceived usefulness to the suspect would be of a continuing nature, through gratification obtained by him.

*Id.*

We are also guided by *State v. Jannetta,* 355 N.W.2d 189 (Minn.Ct.App.1984). There, the police received information regarding the appellant's sexual misconduct, but waited two years before applying for a search warrant. *Id.* at 192–93. Nevertheless, the court determined that the information was not stale. *Id.* at 194. It reasoned:

In any application for a search warrant, a gap of two years from the source of the information to the application for a warrant is of great concern. In the narrow circumstances of this case, however, the gap is less critical than it might be. The juvenile informant gave information about photographs, books and magazines containing photographs he saw in appellants' possession two years earlier. As the trial court noted, these items might be expected to be retained by a person engaged in ongoing criminal sexual conduct. The photographs would likely have enduring utility to the perpetrator for his own sexual gratification.

*Id.; see also Gregg v. State,* 844 P.2d 867, 873, 875 (Okla.Crim. App.1992) (finding that information regarding taking and possessing obscene photographs and videos of children was not stale, despite passage of three years since material was last seen in defendant's possession; affiant averred that he knew from "training and experience" that "individuals who are involved with the sexual exploitation of children and child pornography, rarely, if ever, dispose of their sexually explicit

materials"), *reh'g denied,* 1993 Okla.Crim.App. LEXIS 3 (1993); *People v. Osborn,* 122 Mich.App. 63, 329 N.W.2d 533, 535 (1982) (finding that the "affidavit's allegations of a long history of sexual abuse between the child and defendant and the victim's personal knowledge of the existence and location of the photographs . . . constituted probable cause sufficiently fresh to presume that the photographs were in defendant's residence," although photographs were last seen forty-five days earlier; magistrate did not err in concluding "that defendant would not quickly dispose of pictures but would retain them for his own future perverse enjoyment"); *State v. Jones,* 299 N.C. 298, 261 S.E.2d 860, 865 (1980) (concluding that, as to gloves and hatchet used in murder, probable cause existed five months after offense because items "were not particularly incriminating in themselves and were of enduring utility to defendant").

We are mindful that the places that were searched in the cases cited above were the same locations where the alleged abuses occurred. In contrast, the residence searched in this case was located hundreds of miles from the residence where the alleged crimes occurred. We also recognize that, in the cases mentioned above, none involved a lapse of time as lengthy as the period here. Certainly, as LaFave recognizes,

[t]he nature of the place to be searched and the suspect's relationship to it cannot be ignored. . . . If the offender has relocated his residence between the time of the crime and the time of the search this will sometimes add weight to the argument that the information has become stale.

2 LAFAVE, § 3.7(a), at 353–54 & n. 55 (*citing Kasold v. Cardwell,* 393 F.Supp. 197 (D.Ariz.1975), *rev'd without op.,* 554 F.2d 1069 (9th Cir.1977)).

Nevertheless, we are satisfied that, in the context of this case, the information was not stale. Significantly, it was the items sought in appellant's residence, not the residence itself, which were of critical importance here. Therefore, this case is unlike those in which the particular place sought to be searched is critical to the determination of probable cause. To

illustrate, when a person is a murder suspect, and the police seek to recover microscopic samples of the victim's hair or blood, a suspect's change of residence would obviously be of great significance in the probable cause analysis. In this case, however, the exact location of appellant's residence was not dispositive of the issue; probable cause was not defeated merely because appellant had moved to Illinois. *See* 2 LA-FAVE, § 3.7(a), at 354 n. 55 (noting that probable cause is not necessarily defeated where the items sought are " 'of a sexual nature which it is reasonable to believe the defendant intended to keep.' ") (quoting *State v. Kasold,* 110 Ariz. 563, 521 P.2d 995, 998 (1974)); *see also United States v. Agosto,* 43 M.J. 745, 747, 748, 749 (A.F.Ct.Crim.App.1995) (finding probable cause for search of airman's dormitory room for photographs and telephone numbers of young girls, even though airman had changed dorm rooms after allegedly committing a rape; stating that "a reasonable person would conclude that appellant moved all of his personal papers, like photographs and telephone numbers, to his new residence. . . ."; noting items "were not necessarily incriminating in themselves" and "were not consumable over time"), *rev'd on other grounds,* 46 M.J. 389 (C.A.A.F.1997).

Instead, it was the nature of what was sought that was important here. According to the affidavit, both victims indicated that a footlocker in Behrel's campus apartment served as both a coffee table and a repository for sexual aids and pornographic materials. To the extent that the footlocker functioned as a piece of furniture and a repository for pornographic materials, it never lost its utility. Nor was it perishable. Furthermore, possession of the trunk was not incriminating in itself, so that it would not have been disposed of as contraband. And, the footlocker was readily transportable from one state to another. *See Andresen,* 24 Md.App. at 172, 331 A.2d 78; *see also* 2 LaFAVE, *supra,* § 3.7(a), at 348.

Additionally, the affiant averred that Potter had special training with regard to child abuse and sexual offenses, and had participated "in over 300 crimes involving child abuse and sexual offenses." Potter indicated that, based on his training,

he knew "that sexual offenders tend to keep momentos of prior acts along with pictures and videos." As noted, both victims indicated that appellant used the footlocker for that purpose. The issuing judge was entitled to conclude from the affidavit that a person charged with the sexual abuse and exploitation of children would be likely to retain pornographic material and lewd photographs indefinitely.

Considering the nature of the items sought and the experience of Potter, we are satisfied that the finding of probable cause was not erroneously based on stale information.

## 2. The Good Faith Exception

Alternatively, even if the warrant were not supported by probable cause, we are satisfied that the good faith exception applies here. At the hearing below, the State relied on *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, *supra,* to support its good faith claim. The State argued:

[E]ven should you determine that the probable cause was stale[,] I would ask you to consider the matter of *U.S. v[.] Leon,* which is that 1984 Supreme Court decision which granted a good faith exception where it is demonstrated that an officer has an objectively reasonable belief as a matter of law that he has a facially valid search warrant.

Again, that is a legal decision this court has to make. In fact, you heard during the course of the testimony here today from Trooper Potter, that he has participated in perhaps twenty search warrants, some of which occurred years after the fact and that property was recovered. I would submit to the Court therefore that under the terms of *Leon* even if you should determine that there was no probable cause or that the probable cause was stale these officers, who I submit based upon what you've heard, what's contained in the warrant, is a reasonably well trained officer. And he would know ... he would not have known ... he would not have known that this search was illegal because he had the magistrate's authorization and it was a facially valid search warrant.

There has been no testimony raised here today that any of the officers acting in their capacity when this search warrant was executed had in any manner misled the magistrate. . . .

There is no evidence to suggest that the magistrate has wholly abandoned his judicial role in this proceeding. And there's no showing, [Y]our Honor, that this warrant . . . was lacking, so lacking in probable cause that these officers would have had no objectively reasonable belief that they could utilize the power given to them by the search warrant to execute that search warrant.

And further, [Y]our Honor, that warrant is not so facially deficient, in other words it identifies the place to be searched, it identifies the things to be seized that the officers knew what they were going to size or what place they were going to search and what place . . . what items they were looking for when they executed that search warrant. So I would submit to the Court that under *Leon* . . . that four prong test which is enunciated in that decision, should you find that the probable cause was stale, nevertheless renders a good faith exception to the execution of that warrant and it permits this Court to deny the motion to suppress. . . .

■■ Appellant never addressed the good faith exception at the suppression hearing. Nor did the suppression court reach that issue. Nevertheless, because the issue of good faith was raised below and renewed on appeal, and the question is a legal one, we may consider it. *See McDonald*, 347 Md. at 470 n. 10, 701 A.2d 675; *Coley*, 145 Md.App. at 523 n. 14, 805 A.2d 1186; *Braxton*, 123 Md.App. at 631–32, 720 A.2d 27.

■■ In *Connelly, supra*, 322 Md. at 735, 589 A.2d 958, the Court recognized that because the "application of the good faith exception to the allegations of the affidavit presents an objectively ascertainable question, it is for the appellate court to decide whether the affidavit was sufficient to support the requisite belief that the warrant was valid." When the record does not contain a finding as to the good faith question,

however, "we are confined to the language of the affidavit in reviewing the applicability of the good faith exception." *State v. Darden*, 93 Md.App. 373, 397, 612 A.2d 339, *cert. denied*, 328 Md. 447, 614 A.2d 974, and *cert. denied*, 508 U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 673 (1993).

Appellant contends that the good faith exception does not apply, because "no reasonably well trained officer should have relied on this warrant." He asserts: "This is not a case where the officers had personal knowledge sufficient for probable cause but inadvertently failed to specify any date of the claimed criminal activity." Further, Behrel argues:

> At the suppression hearing, Trooper Potter admitted that he had no direct evidence from any source that there was anything in Mr. Behrel's residence in 2001 that would supply evidence of the offenses fifteen to twenty years earlier. No one had gone in his residence to claim that any evidence was inside. The affidavit failed to mention any surveillance of the Behrel residence nor does it appear that any was done. All that existed was Trooper Potter's belief that if Behrel was a sexual offender, he might keep mementoes. The request to search for computers and computer hardware (when neither Curtis nor Miller nor anyone else indicated that Behrel even owned a computer) is indicative that the search request was based on hunches rather than probable cause.

The Supreme Court promulgated the good faith exception in *United States v. Leon, supra*, 468 U.S. 897, 104 S.Ct. 3405, and the companion case, *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). Notwithstanding the importance of the exclusionary rule to Fourth Amendment jurisprudence, the Supreme Court determined in *Leon*, 468 U.S. at 918, 104 S.Ct. 3405, that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." Moreover, in *Sheppard*, 468 U.S. at 989–90, 104 S.Ct. 3424, the Supreme Court "refuse[d] to rule that

an officer is required to disbelieve a judge who has just advised him . . . that the warrant he possesses authorizes him to conduct the search he has requested." Thus, the cases provide for the admissibility of "evidence seized under a warrant subsequently determined to be invalid . . . if the executing officers acted in objective good faith with reasonable reliance on the warrant." *McDonald,* 347 Md. at 467, 701 A.2d 675; *see Nero v. State,* 144 Md.App. 333, 351–52, 798 A.2d 5 (2002).[6]

As we explained in *State v. Riley, supra,* 147 Md.App. at 130, 807 A.2d 797, " '[e]ven when the warrant is bad, the mere exercise of having obtained it will salvage all but the rarest and most outrageous of warranted searches.' " (Citation and emphasis omitted). *See Ashford v. State,* 147 Md.App. 1, 23, 807 A.2d 732, *cert. denied,* 372 Md. 430, 813 A.2d 257 (2002). Nevertheless, *Leon* made clear that there are circumstances when exclusion of evidence remains the appropriate sanction, even if an officer "has obtained a warrant and abided by its terms." *Leon,* 468 U.S. at 922, 104 S.Ct. 3405. This is because "the officer's reliance on the magistrate's probable-cause determination . . . must be objectively reasonable, and it is clear that in some circumstances the officer [ ] will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922–23, 104 S.Ct. 3405 (citations and footnotes omitted). *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (stating that police officers "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a[n arrest] warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be

---

**6.** As LaFave points out, " 'when the Court speaks of the good faith of the police, it is talking about their good faith *before going* to the magistrate and not about their good faith *after* they have received the warrant. . . .' " 1 LaFave, § 1.3(f), at 90 n. 115 (citation omitted). LaFave explains: "Were it otherwise, an officer or agency possessed of facts insufficient to establish probable cause could circumvent the Fourth Amendment by the simple device of directing or asking some other officer or agency to make the arrest and search." 2 LaFave, § 3.5(b), at 255–56.

recognized."); *Minor v. State,* 334 Md. 707, 715, 641 A.2d 214 (1994) stating that "the question is whether a reasonably well-trained officer would have known 'that his affidavit failed to establish probable cause....'"; officer has a duty "to withhold from presentation [sic] an application for a warrant that a well-trained officer would know failed to establish probable cause." (citation omitted).

The *Leon* Court recognized four situations that justify the sanction of exclusion. They include:

> (1) if the magistrate, in issuing a warrant, "was misled by information in an affidavit that the affiant knew was false or would have known was false except for a reckless disregard of the truth," or (2) "in cases where the issuing magistrate wholly abandoned his judicial role ... [so that] no reasonably well trained officer should rely on the warrant[,]" or (3) in cases in which an officer would not "manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or (4) in cases where "a warrant may be so facially deficient—*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume [the warrant] to be valid."

*McDonald,* 347 Md. at 468–469, 701 A.2d 675 (citing *Leon,* 468 U.S. at 923, 104 S.Ct. 3405).

Accordingly, despite judicial "authorization" to search, good faith does not apply if a "reasonably well trained officer would have known that the search was illegal...." *Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. 3405; *see United States v. Hale,* 784 F.2d 1465, 1470 (9th Cir.) (recognizing that a reasonably well-trained officer is required to know "well-established current law."), *cert. denied,* 479 U.S. 829, 107 S.Ct. 110, 93 L.Ed.2d 59 (1986); *United States v. Savoca,* 761 F.2d 292, 297 (6th Cir.) (noting that a reasonably well-trained officer is aware of relevant court decisions), *cert. denied,* 474 U.S. 852, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985); *Lamb v. State,* 141 Md.App. 610, 631, 786 A.2d 783 (2001) (stating that " 'good

faith' is to be measured by an objective standard by which an officer is charged with the knowledge of the law . . .").

In this case, even if the affidavit did not establish probable cause, we would agree with the State that a reasonably well-trained officer would have believed that "the evidence sought would likely be found at Behrel's residence in Illinois." We explain.

In challenging the applicability of the good faith exception, appellant relies on Potter's admission "that he had no direct evidence from any source that there was anything in Mr. Behrel's residence in 2001 that would supply evidence of the offenses fifteen to twenty years earlier." Given that testimony, appellant maintains that no reasonably well-trained officer could have reasonably believed that there was probable cause for the warrant, as "[a]ll that existed was Trooper Potter's belief that if Behrel was a sexual offender, he might keep mementoes."

In his long career with the Maryland State Police, Potter received extensive training about sexual offenses, and was involved in the investigation of over 300 such cases. The affiant averred that Potter "learned through his training that sexual offenders tend to keep mementoes of prior acts along with pictures and videos." Moreover, Curtis and Miller both told Potter that appellant kept pornographic movies, magazines, photographs, and sexual aids in a footlocker that he used as a coffee table. In our view, it was reasonable for Potter to believe that, even if appellant moved out of state, he might have taken the footlocker with him, because it was not perishable; it would not have been difficult to transport; and it would not lose its utility.

Accordingly, we are satisfied that a reasonably well-trained officer would not have known that the affidavit failed to establish probable cause to search for the footlocker and pornographic materials stored in it. Therefore, we conclude that, even if the affidavit was not based on probable cause, the good faith exception applies here.

## II. THE TRIALS

## A. THE CURTIS TRIAL[7]

### 1. Factual Summary

Curtis was born on November 27, 1967; at the time of appellant's trial in February 2002, Curtis was thirty-four years old. From the fall of 1982 until the spring of 1986, Curtis was a boarding student at SJS. During that time, appellant served as the School's chaplain.

At trial, Curtis recalled that he was sent to SJS, in part, because he did not have a good relationship with his stepfather and was acting out in school. Curtis explained that he became involved in church activities at SJS because he "was kind of looking for something comforting in [his] life, and the church seemed to be ... willing to provide that for [him]." Through his involvement in church activities, Curtis had close contact with appellant.

During his first year at SJS, Curtis became an acolyte, which is "a person [who] helps the priest run the service...." In his second year at SJS, Curtis was elevated to the position of sacristan, a select group of six or seven students who assisted the chaplain. Curtis described the role of the sacristan as follows:

> ... [I]n terms of function at Saint James, they would go lay out the robes, the different dressings for different religious holidays. They put the chalice, the wafers, the wine, so on and so forth on the alter [sic] in preparation for the following day's service, and they would also participate in the service by overseeing the acolytes during the service.

According to Curtis, his relationship with appellant began to change in February 1983, when he was fifteen years old. Curtis recalled that one night, he and a group of students had

---

7. The State proceeded first with the Curtis trial. Appellant was arrested on March 12, 2001, and the Curtis trial was initially scheduled for October 1, 2001. Because appellant was hospitalized on September 30, 2001, the Curtis trial did not begin until February 6, 2002.

been watching a movie in appellant's campus apartment. Curtis remained after the other students left, "talking about the ... church and so on and so forth." According to Curtis, while he and appellant were sitting together on the couch, watching television, appellant "slid his foot into my lap." When Curtis did not resist, appellant used his hand to rub Curtis's "crotch area." The activity progressed to oral sex that night and, within a month and a half, to sodomy. Curtis estimated that, over a two year period, continuing until "probably half way through [his] junior year" of high school, he was subjected to about twenty-five or thirty incidents of abuse. Then, Curtis stopped going to appellant's apartment.

During Curtis's sexual encounters with appellant, Behrel showed him pornographic magazines and movies that he stored in a footlocker that functioned as a coffee table in the apartment. Appellant also kept sexual aids in the trunk. Curtis identified the footlocker or "trunk" recovered from appellant's Illinois residence as the same one that appellant kept in his School apartment. The trunk was later introduced in evidence.

Curtis acknowledged that he was very ashamed of what happened. Responding to the State's inquiry as to why he "submitted" to appellant, Curtis said:

[T]hat's a good question. I ..., I ask myself that probably twenty-five times a day. I'm really not sure, you know, at the base of me, but I feel like I was having trouble with my step father, my family relationships, and I think kids have a couple of ways of going at that time. They can either act out or kind of, you know, stay by themselves. I chose to stay by myself, and one of the other reasons my mother sent [me to] Saint James was to find some good role models. You know, I wasn't getting along with my step father. So I ..., I feel like I needed love so bad, I would have taken it any way that I could have gotten it at that time. You know, I just needed male companionship, the church, [appellant] showing an interest in me in what I did and, you know him wanting me to join the club, you know, the church, and so on and so forth. I just think I really needed somebody to help

me along. Plus I was, you know, I was a farm kid at Saint James, you know, which is a rather prestigious prep school, and I was pretty [much] not at home. You know, I was very nervous, very lonely.

Curtis claimed that he never told anyone at SJS about the abuse. In 1998, however, after Curtis told his therapist what had happened, he reported the matter to law enforcement officials in Montana. Shortly thereafter, Curtis began working with TFC Potter. In connection with that investigation, Curtis made a recorded telephone call to appellant in March 2000.

Although Curtis knew Miller, he maintained that he and Miller were not friends. Defense counsel established, however, that Curtis and Miller both played on the School's lacrosse and football teams, and Curtis identified himself and Miller in a team photograph in the 1984 School yearbook.

Curtis admitted that he was never physically forced to participate in sexual activity with appellant. Appellant's counsel also established that Curtis performed oral sex and anal sex upon appellant, and invited appellant to his graduation party.

Trooper First Class Charles Faith of the Maryland State Police testified that he arranged for Curtis to make a recorded telephone call to appellant on March 16, 2000.[8] The tape of the conversation was then played for the jury and admitted in evidence. The following portions of the conversation are of particular interest:

[CURTIS]: Well, uh, you sodomized me. You, uh, abused me. Do you remember that?

[APPELLANT]: No.

[CURTIS]: You don't?

[APPELLANT]: (Silence.)

---

8. Prior to trial, appellant unsuccessfully moved to suppress the taped conversation. Appellant has not challenged that ruling on appeal. Although a transcript of the tape was prepared, only the tape itself was admitted into evidence.

**106**

[CURTIS]: ... You spent two years abusing me at Saint James when I was fifteen years old. And I'm trying, you know, I've been having (sigh), been having lots of problems, Father Behrel, for this ...., its [sic] messed me up bad. Been having lots of health problems, and ... I need some answers from you.

[APPELLANT]: (Silence.)

[CURTIS]: Why would you do that? Why did you do that?

[APPELLANT]: I don't ... I don't know what you're saying.

[CURTIS]: You don't know what I'm saying?

[APPELLANT]: I've had ... I've had my own problems, and ... through my life, and I've gone to, you know, testing and psychological things and all these sort of things to be where I am now, and I've lived ..., I've lived a good life, and my problems that I've had, um, you know, I've had to deal with.

[CURTIS]: Well you need to deal with my problems too, Father Behrel, because, uh, you know, I'm really glad that ..., that you've taken care of your part of it, but, uh, you left a big wake, you know. I'm thirty years old,[9] and it's fifteen years later, and uh, I haven't been able to deal with it.... I need to find some kind of peace with this, you know.... I need to come to a conclusion that it wasn't my fault, Father Behrel. You know, I've spent fifteen years believing that it was my fault, and that I was dirty and nasty.

[APPELLANT]: Well, if you were fifteen, it couldn't be your fault.

[CURTIS]: Well, it wasn't.

[APPELLANT]: And I mean to be fifteen and to blame yourself fifteen years later when you're thirty, and it's not your fault.

---

9. As Curtis was born on November 27, 1967, he was actually thirty-two years old on March 16, 2000.

[CURTIS]: Well ..., why would you do that? How could you do that? How could you do that?

[APPELLANT]: (Silence.)

[CURTIS]: I mean you used me, Father Behrel. You were like my priest. You were my priest. You brought me into the church. Remember confirmation classes? You know, all that stuff. You brought me into the church. I can't even go to church anymore because of this.

[APPELLANT]: (Silence.)

[CURTIS]: You know, how could you do that to me?

[APPELLANT]: (Silence.)

* * *

[APPELLANT]: ... Well, I mean the thing is ... it's certainly not your fault for bad things that happened to you ... especially when you're that age and ...

[CURTIS]: Well was it your fault? ....

[APPELLANT]: Well I don't know, but ..., I mean I was in a situation that I didn't want to be in.

* * *

[CURTIS]: How's that? What situation was that?

[APPELLANT]: Because I had to go out there to work, and I wanted to come back after a year and ..., and I couldn't, and I just had to ..., I just had to wait. I had no one to relate to out there, um, no social life or anything, and I had to, you know, the kids in my apartment all the time, um, and that was, that was my life. I didn't have a social life, and I needed to be out of that situation.

[CURTIS]: Well, obviously, you know, since [you] were taking advantage of ... kids there, you know.

[APPELLANT]: Well I don't know ..., I don't know what you're saying about that, but ...

[CURTIS]: What do you mean you don't know? You sodomized me, Father Behrel, for two years ....

▮▮▮▮▮▮▮▮▮▮

[APPELLANT]: Are, are you, are you because, because this is a thing now, are you looking, you know to make money from someone?

[CURTIS]: No. I'm here, you know what? I'm like, my kidneys are failing from hypertension. Uh, you know, I've lived for fifteen years with this stuff. I'm trying, you know, my life has been basically over since the end of that. You know, and I'm trying, I'm thirty years old, thirty-two years old, and I'm trying to move on with my life, and I can't close this chapter of my life without speaking with you about it. It doesn't work. I've been in therapy for two years, if, and I just came to the conclusion that I needed to, I needed to confront you about it. I want my power back. You took it all away from me. Now I want it back, and I want some answers from you. I mean, Saint James, my mother sent me to Saint James to, uh, become a better person, you know, to have good male role models and this is what, you know, this is what I got. I never graduated from college. I haven't, I haven't done anything in my life, and I, and I blame you for it. And I need to get passed [sic] this, and that's why I'm calling you. I'm not looking to make anything from anybody. (Pause) I mean doesn't that make sense to you that, you know, I would, I would, uh, you know, be looking for a little closure in all this? I mean you've been through the therapy.

[APPELLANT]: Well after fifteen years, yeah, I went to therapy too, um, and ..., and the Diocese insisted that I go through psychological testing and all sorts of things. I mean even ..., I even had ..., had, um, checks on past history from childhood up and I mean everything through this, you know.

\* \* \*

[APPELLANT]: Well I know ... I'm not a very good priest....I'm trying to be. Um, I don't know what to say. I don't know how to help.

[CURTIS]: Well you can say you're sorry for one. You know, you could just say you're sorry....

[APPELLANT]: Well better . . ., well better than sorry, I can ask your forgiveness. . . . I just wanted some companionship . . . and some innocent love. Um, because like now, I mean . . . I have friends that, you know, I count on to talk to, and . . ., and you know, they show me love, um, when I'm down and things like that, and I hadn't had any one [sic] like that. And it was just a bad part of my life. . . . I didn't want to go there. I wanted to come back. After I was there a year and I finally got to go after five years, and . . ., and that's when after that . . ., I mean I went to confession, uh, I went to counseling, and then because of all this being such a big thing in the 90's, um, you know, the Diocese put us through these . . ., these, um, these battery of tests . . . (inaudible) . . . .in Chicago. I mean a whole week long and stuff and things like that. I mean I was . . ., I was a subject of . . ., of the situation that I was in.

\* \* \*

[APPELLANT]: . . . [A]nd as far as any sort of sexual activity or anything, I mean I haven't done any of that stuff. . . .

[CURTIS]: What do you mean you haven't done any of that stuff, Father Behrel? . . .

\* \* \*

[APPELLANT]: I'm talking about my life since . . .; since I've been here. Um, you know, I mean I'm, you know, I'm fulfilled because I have . . ., I have friends who care about me and love me and that sort of thing, which . . ., which I didn't have.

\* \* \*

[CURTIS]: Well tell me it wasn't my fault. You know, tell me that . . ., that it was you and that you took advantage of me . . . .(sigh) . . ., you took advantage of me.

[APPELLANT]: I know it wasn't your fault. You shouldn't blame yourself for this.

[CURTIS]: How can I not? You know, how can I not? You know . . . you knew what my family life was like. You

knew that I wasn't the strongest. I was some little farm boy off the farm, you know, and in the crowds with a bunch of rich people kinda of [sic] lost anyway, and you took me under your wing and this is what you did to me. (Pause) How could you do that? I mean are you ... tell me you're still not doing it?

[APPELLANT]: I told you I've been here fifteen years, and ... I've been celibate.

[CURTIS]: Well that's a load off my mind cause it scares me.

[APPELLANT]: All I want to do..., all I wanted to do is ... well I don't know that I can be of sense right now, but be a minister ... as best I can, and I mean I can ..., you know, I went through this counseling and everything, and I went to confession, but it's ..., it's not going to erase, but I can attempt, fifteen years. I mean I've lived a good life, a chaste life.

\* \* \*

[APPELLANT]: When ... I left [SJS], that's when I decided that, you know, that maybe that ..., back when .... back when I thought this was ..., this was me, this was just my personality, um and I mean, you know, from counseling and stuff, I realize that because I wasn't, you know, I was ...., I was always a good person before, you know, before, um, I mean, you know, when all this ..., and ..., and it was ..., it was that situation that I was in that was like being in prison, and ..., and I had no help with it or anything and....

On February 4, 2002, two days prior to the commencement of the Curtis trial, appellant filed a motion *in limine* to exclude Jeffrey Miller's testimony on the ground that it constituted inadmissible "other crimes" evidence. Following an evidentiary hearing held during trial, the court denied the motion. Accordingly, the State presented Miller's testimony as to appellant's sexual abuse of him. After several preliminary questions, the court gave the following limiting instruction to the jury:

Counsel, let me interrupt at this time and instruct the jury. Ladies and gentlemen, the testimony that you may hear is being admitted for a limited purpose. You must not consider this testimony to prove that [appellant], to prove that if [appellant] committed a prior bad act or criminal act that he would be prone or have a propensity to commit another bad or similar act, or criminal act, or that the defendant is a bad person. So you're not to consider it for that purpose. The testimony is being offered, once again, for a limited purpose and that is the State is, I believe, attempting to prove that the defendant utilizes a particular method in committing acts of a similar nature. That is part of the case, or part of the issue that is presented in this case, and that is the only purpose for which this testimony is being admitted. You may proceed.

Miller testified that he entered SJS in the fall of 1981 for the tenth grade. During his first year, he and appellant lived in the same dormitory. Miller became an acolyte in his first year at the School, which brought him into contact with appellant. Then, in eleventh grade, appellant selected him to become senior sacristan, a position described by Miller as "the highest figure ... in the church as far as the student body goes." As a result, he worked "in a closer fashion" with appellant.

In his junior year, Miller lived in a dormitory room directly next to appellant's apartment. According to Miller, appellant counseled him regarding his parents' divorce. Miller also testified that he and other students "regularly" visited appellant's apartment. He identified the footlocker seized in the search of appellant's residence as the "chest ... used as a coffee table in the living room" of appellant's apartment at SJS. Miller claimed that appellant kept pornographic materials in the footlocker, such as "explicit" magazines and movies, and "inhalants" and "other drug paraphernalia," such as " 'rush' or 'poppers,' " which appellant provided to Miller. In addition, Miller claimed that appellant photographed him in the nude and kept the pictures in the footlocker.

Miller recalled that appellant began to abuse him sexually during his first year at SJS, when Miller was fifteen. The abuse began with a "massage" of Miller's "groin," and appellant then "proceeded to massage" Miller "underneath [his] clothes." According to Miller, the sexual contact "progressed to oral sex and then to, uh, anal sex." Moreover, Miller claimed that appellant abused him "on a regular basis," in "excess of fifty" times.

Miller conceded that appellant never physically forced him to engage in sexual activity. He also testified that, until he spoke with Potter in 2000, he had not revealed the abuse to anyone, not even his wife. Acknowledging that he was "ashamed" of what happened, Miller explained why he submitted to appellant. He said:

> I was manipulated, coerced through the relationship that I had developed with him, a period of my life where I was relatively young, trusting in him, naive. Uh, and I think he took advantage of that and gained control of me.

The following testimony is also illuminating:

[STATE]: During the time you were at Saint James, did [appellant] have power to discipline you?

[MILLER]: Yes.

[STATE]: Did he have the power to effect [sic] your status at the school?

[MILLER]: Yes.

[STATE]: Who chose the sacristans at Saint James?

[MILLER]: Father Behrel.

\* \* \*

[STATE]: Who chose the senior sacristan?

[MILLER]: Father Behrel.

[STATE]: Did [appellant] have the ability to reward you while you were at Saint James?

[MILLER]: Yes.

[STATE]: Did he reward you?

[MILLER]: Yes.

[STATE]: Did he have the power to shield you from discipline there?

[MILLER]: Yes.

[STATE]: Did he do that?

[MILLER]: Yes.

Further, Miller explained:

When I had come back from the [spring break] into my junior year, uh, I tried to stay away, and when I'm referring to [being] coerced and manipulated, that was the time period where he, uh, it's hard to kind of put into words the, the way ... he would make my life more difficult. At that time I was on his hall in my junior year in the room adjacent to his apartment, and he made my life more difficult.

Appellant sought to impeach Miller's credibility by showing that Miller knew Curtis, even though he had told Potter in June 2000 that he did not; Saint James was a small school of about 150 students when Miller and Curtis attended; Miller and Curtis were on the football and lacrosse teams together, although they were not in the same grade; and, while Miller was in college, he visited appellant several times in Illinois.

As part of his defense, appellant presented several character witnesses who were members of appellant's parish in Illinois.[10] But, the witnesses did not know appellant when he served at SJS.

Appellant also testified in his own behalf. Although Behrel admitted that he is a homosexual, he denied having any sexual contact with Curtis. He also denied that he knew of Curtis's home situation, and claimed he did not attend Curtis's graduation party. Appellant further testified that, during the summer of 1987, two years after he left the School and relocated to Illinois, he planned a visit to Maryland. According to appellant, when Curtis learned of his impending visit, Curtis

---

10. Appellant also presented the testimony of a former student; that testimony is not relevant to the issues before us.

contacted him and the two had dinner. As a result of the charges, appellant claimed that he lost his position as a pastor.

Appellant explained the recorded conversation that he had with Curtis on March 16, 2000, as follows:

[APPELLANT'S COUNSEL]: And with regard to the phone conversation that was played in here, when Mr. Curtis said, "you sodomized me, you abused me. Do you remember that?", and what did you reply? Did you reply that you remembered that?

[APPELLANT]: I said, "I didn't[.]"

[APPELLANT'S COUNSEL]: Okay, and when he was saying . . ., this is on the first page, "how can you say that you spent two . . ., how can you say that? You spent two years abusing me[,]" do you remember what you replied then? Did you remember . . . ., did you know what he was saying?

[APPELLANT]: Yeah, um, in regard to abusing?

[APPELLANT'S COUNSEL]: Right. Do you remember what you replied?

[APPELLANT]: No.

[APPELLANT'S COUNSEL]: It was played for the jury, uh, but let me ask you this, after denying remember[ing] sodomizing him, there is a part where you say, "well better than sorry, I can ask your forgiveness[,]" why did you ask him . . ., his forgiveness, if you didn't do these things?

[APPELLANT]: Well saying you're sorry is sort of a secular term, forgiveness is more of a religious term, and since, you know, we were talking about more religious things and stuff, and uh, um, I just . . ., it's just a natural thing to go from saying I'm sorry to asking forgiveness, and the church, just like love has a different meaning in the world than it does in the church.

Appellant also acknowledged that he knew Miller, and recalled that Miller was a senior sacristan when appellant was the chaplain of SJS. But, he denied having any sexual contact with Miller. According to appellant, the choice of senior

sacristan was "something always discussed amongst the [sa-cristan] group." Appellant noted that Miller visited him several times in Illinois after he graduated from SJS.

In closing argument, the prosecutor sought to demonstrate a common scheme and plan by appellant with respect to his victims. The State also relied on Miller's testimony to support Curtis's version of events. The State argued:

> Now [appellant] has admitted, taken the stand and admitted that he's a homosexual. Well that's fine. That's fine, but why did he keep all this heterosexual stuff. Why did he keep this heterosexual magazine and . . . these tapes with heterosexual acts in them? What purpose could he have for that?
>
> * * *
>
> [T]o set a trap, and we know that this trap was set and that there was a pattern, a scheme, and preparation that [appellant] chose his victims and molded them the way he wanted. How do we know that? By the testimony of Jeff Miller. It's clear when you look at the testimony of Matt Curtis and Jeff Miller that these guys mirror each other. Both of them were fifteen when they went to Saint James. Both of them were in their first year at Saint James when all of this started. Again, [appellant] befriended them, encouraged them both in the church. Both boys were very vulnerable, isolated, and had family problems, divorces, and [appellant] counseled them about it. Both boys trusted [appellant]. Both boys became acolytes and then sacristans in the church, which exposed them even more to [appellant]. They held a position of honor in that . . . ., in the church at Saint James, and that was important. And ladies and gentlemen, he was responsible for them. He had the ability to discipline them. He shielded them from discipline. He rewarded them. And in both cases, all the abuse took place in [appellant's] room on campus in the students' dorm. And both boys said they went there voluntarily. Both boys described pornography and inhalants. Both described this [foot]locker. The abuse in both cases started off as fon-

dling, progressed to oral sex, then went on to anal intercourse. Both felt manipulated, controlled, and both submitted to [appellant]. They didn't lie to you. They consented. They weren't forced physically, and the abuse occurred on a regular systematic basis, and neither Jeff or Matt told anybody about this for years and years.

\* \* \*

That taped phone call, you decide if those are the words of an innocent man. Talked about this [foot]locker and low and behold, there it is and the pattern of abuse that Jeff Miller was subjected to. Ladies and gentlemen, child abuse is always wrong always, but when it's committed by a priest · who preys on vulnerable kids, it's even more hideous. This man has violated the trust and used his position in that church to satisfy his own desires, not caring at all about the impact that it would have on his victims.

During its instructions to the jury, the court reiterated: "You have heard evidence that the defendant committed the crime of child abuse with regard to Jeffrey Miller, which is not a charge in this case. You may consider this evidence only on the question of common scheme or plan, preparation, or identity."

## 2. Motion *in Limine*

As we noted, two days prior to the Curtis trial, appellant moved to exclude Miller's testimony, claiming it constituted inadmissible "other crimes" evidence. The court denied the motion after an evidentiary hearing at which Miller and several others testified. Miller's testimony at the hearing was substantively the same as the testimony he gave at the trial, and therefore we need not recount it here.[11]

In support of his motion, appellant presented the testimony of Eugene Brown, a parishioner at St. Andrew's Church in Grayslake, where appellant served as rector from 1986 until

---

11. With respect to appellant's sexual activities, Miller's testimony at the motion hearing was actually more graphic than his trial testimony.

his arrest in March 2001. Brown recalled that Miller had visited appellant on two occasions, one in 1986 and the other in 1987 or 1988.

Appellant also testified at the motion hearing. He denied having a sexual relationship with Miller, and denied ever using Miller's position as sacristan to coerce Miller to have sex. Moreover, according to appellant, Miller visited him in Illinois "maybe eight times."

Thereafter, defense counsel urged the court to exclude Miller's testimony. Appellant's counsel said, in part:

> ... Your Honor, ... there is a three-prong test, and I would argue that the first test is not met by the State in trying to get evidence of one act admitted into this case to prove a criminal act to another.... [E]vidence of another crime can be used to prove motive. Well there's no need upon the State, and there's no issue of motive here. The same way with intent. There's no requirement that the State prove intent in the child abuse statute. Absence of mistake or accident, well there's no clearly, you know, ..., no defense is being raised at all, "gee, we did it, but we did it by accident[.]" Then we come to identity. There's no, you know, there's no issue that whether, you know that Mr. Curtis can't positively identify who did this to him, and therefore needs some help by perhaps showing evidence of his signature or showing evidence of MO, *modus operandi,* and it was my understanding in chambers that the State was putting forth, well it's a pattern or *modus operandi,* and that's the exception they're seeking that it's some type of pattern, and the problem with that analysis is that the State does not have to prove any pattern in here. What the State is trying to do is produce evidence of a pattern to show that he's guilty in this particular act....

* * *

> Secondly, ... we come to the next hurdle and that's whether or not ... the State can show by clear and convincing evidence that these acts occurred. Admittedingly [sic], Mr. Miller took the stand and said that, "well, yeah I said was

[sic], you know, coerced and threatened[.]" Well then we later learned that even after he's out of the Saint James School in college, in his third year of college, he's still visiting Father Behrel. I'm saying it's not consistent ... with a finding that the act did occur. Could it have occurred? Sure. Is the State gonna be able to go forward on that on another day? Yes, but they should not be allowed to bring in evidence of this alleged other crimes in order just to prove that it occurred here. And that brings us to the third issue, you know, the balancing test of unfair prejudice, and I do believe that it's unfair prejudice to bring in testimony about another crime in order to prove the crime at hand especially when there's no special or heightened relevance of his testimony, Mr. Miller.

In response, the State argued, in part:

I think Mr. Miller was extremely credible on the stand, and he was truthful to the Court, and the Court even has an independent entry in [Miller's] yearbook that supports Mr. Miller's testimony. I certainly think there is clear and convincing evidence that Mr. Miller was in fact abused by the defendant. As to the issue of unfair prejudice, Your Honor, ... [appellant's counsel] has indicated that in this situation, it would be unfair for the State to prove propensity evidence, and we admit that.... *The State is not trying to prove that the defendant has a propensity to have sex with young boys. The State is trying to prove that there is a pattern and a choice of victims in this case, and that pattern contains a clear common scheme and plan.*

(Emphasis added).

The State continued, acknowledging that Miller's testimony was crucial to the matter of Curtis's credibility:

Your Honor, in [appellant's counsel's] opening argument to the Court, he indicated specifically that the credibility of the victims, or the victim, and the long delay in reporting were things that he wanted the jury to focus on. Those are going to be the defense issues, and Your Honor, *in this situation where it's clear the credibility of Matt Curtis is in*

*jeopardy, and where there's been a long delay in reporting, the need for this evidence and the value of this evidence is even greater.*

\* \* \*

[T]he *Merzbacher* [*v. State,* 346 Md. 391, 697 A.2d 432 (1997) ] case really has the most to do with the instant facts. Clearly the delay must be explained by the witnesses. The delay in reporting is a common thread here, and the Court has heard the manipulation, the confusion, the vulnerability of the victims, and all that goes to the credibility of the victims, and it goes into evidence pursuant to the Court's ruling, the Court of Appeals ruling in *Merzbacher.*

(Emphasis added).

In addition, the State relied on the claim that the evidence as to Miller demonstrated a common pattern or scheme, stating:

In this case, both boys were between fourteen and fifteen when the abuse started. . . . Both were in their first year of Saint James when the abuse started. Both of them had family problems and divorce issues, which they believe, made them isolated and vulnerable. Both were encouraged to become involved in the church. They were counseled by [appellant]. He shielded them from discipline. The abuse took place, according to testimony you heard today, on campus at Saint James, but there was no physical force used in either case. That the abuse started as fondling then progressed to fellacio [sic] and then sodomy in both cases. That there was a footlocker that both witnesses identified as being in . . . [appellant's] apartment contained [sic] pornography and inhalants and were given to the witnesses. Both had prestigious positions at school being acolytes and then sacristans at Saint James and that the abuse occurred on a regular and systematic basis, and that both waited for years before reporting, and they told the Court why that was and what had happened to them. . . . Your Honor, the State is not introducing evidence that the defendant has a propensity to have sex with boys. *What the State is seeking to show*

*is that there was a pattern of abuse, a systematic pattern*
*that mirrors each other.*

(Emphasis added.)

In denying appellant's motion, the court reasoned:

Well, you know in a case like this, it's easier to deal with
the second prong than with anything else. Of course every-
one acknowledges that Rule 5–404 prohibits the use of
evidence of other crimes, wrongs, or acts to prove the
character of the person in order to show acts in conformity
therewith. However, the Rule also states that, "however,
such evidence may be admissible for other purposes such as
proof of motive, opportunity, intent, preparation, common
scheme or planned knowledge, identity or absence of mis-
take or accident[.]" The testimony that I've heard from Mr.
Miller, I must admit, is extremely credible. Having ob-
served him testify, the manner in which he testified, the
apparent difficulty that he has in brining [sic] forth in a
courtroom setting that perhaps what he feels now to be
humiliating experiences in his life were extremely credible
to me and believed by me to have taken place as he
testified. I don't believe the testimony of [appellant] ...
[about the] yearbook. . . .

\* \* \*

There has been clear and convincing evidence that the
events occurred as testified by Mr. Miller.

\* \* \*

The main difficulty here is trying to have what the State
wants to do fit into a special circumstance, an exception to
the general rule [against the admission of other crimes
evidence]. In this case we do have a lot of similarities. We
have two young men, who allegedly began to be abused by
the defendant, Mr. Curtis in 1983, I believe, in the winter of
1983 when he was fifteen years of age ... and Mr. Miller,
who began to be abused allegedly in the spring of 1982, ...
was fifteen years of age as well. Both of them had gone to
the apartment of Mr. Behrel, Father Behrel, first with other
people and then began to show up alone, extensively for

gatherings. On other instances for conferences with regard to their religious services, or in other instances, simply to talk about some of the problems and issues involved in their lives.

\* \* \*

Both of them were interested in the religious activities involved at Saint James. Both of them were borders [sic] at Saint James. Both of them were encouraged by [appellant] to become acolytes and then sacristans. And both as well felt that their positions within the Saint James community particularly that of sacristan and Mr. Miller, the senior sacristan, were positions of honor that could have in some way been effected [sic] by the actions of [appellant] at that time. He was in charge of this particular religious activity within the community as testified by both. Both of them also testified that they were having severe difficulties in their lives, their personal lives, because their parents were separated and obtaining divorces....

In addition, the court found that both victims "were particularly vulnerable because of their similar experiences with their home and family lives...." The court observed that "their home situations were known by [appellant] at that time or were disclosed to him during the course of their conversations with [appellant]." Moreover, both victims testified that they "developed a close relationship with [appellant], going there to watch movies, to talk about their issues in their lives." The court added: "Both of them also described the initial physical contact as fondling leading to fellatio and then leading to anal sex with the defendant. Both of them also described feeling subtle pressures to ... continue with this relationship."

The court continued:

[A]lthough the State could prove by other methods, for instance identity, or for instance opportunity ... there's nothing wrong with the State trying to bolster its proof of such issues that are critical to the ... fact finder. *And in this case, the identical or the very similar method of the alleged abuse, the method by which the defendant allegedly*

*groomed people, young men fifteen years of age, identical in age, who had the same or identical type of home situations, who had the same vulnerabilities, may be sufficient to show a method of the crimes to earmark them as the handy work of the accused who had certainly plenty of opportunity to know about the backgrounds, the difficulties of these young men and the need for them to gain acceptance from someone such as someone in a position of power in their lives, such as, once again, [appellant].*

(Emphasis added).

The court concluded:

So I find that based on all that I've heard the similarities between the preparation and the grooming of the victims for the abuse, similarities in the abuse itself, the identical ages, in fact the overlapping time periods when these offenses occurred, the identical placement of the alleged abuses, the Court finds that it does fit within a niche, and I'm not sure what it should be called, whether it's identity, opportunity, preparation, identical method earmarking of the handy work of the accused, whatever you may want to call it, there seems to be a niche within the Rules that creates an exception for testimony such as this, once again, to allow the State to show the identical method of the grooming of young men, fifteen years of age, under the circumstances presented here for the abuses alleged in this case. That leads to the question of prejudice. There is prejudice here, but in all cases there is prejudice when the State attempts to prove evidence that may lead to circumstantial or even direct evidence of the guilt of the defendant. But whether it's unfair prejudice or not is a weighty question for a Court to consider.

\*　　\*　　\*

. . . I think the need for the State to prove the methodology, the handy work of the accused, and the earmarking of that handywork [sic] is that of the accused in this case as to make it more probative than prejudicial; and therefore, based on what I can see here because I find that there is

some exception to the general rule in this case, the court is going to allow the testimony of Mr. Miller, but only for the limited purpose of not, of course, not proving propensity of the defendant to commit the crime of a similar nature but to prove identical methodology earmarking the handy work of the accused, preparation of similar crimes.

### 3. Discussion

Appellant contends that the court erred in admitting Miller's testimony at the Curtis trial, because it constituted inadmissible "other crimes" evidence under Maryland Rule 5–404(b). He maintains that "[t]here was simply no special or heightened relevance in Miller's testimony as to what [appellant] did to him to prove any element of the Curtis child abuse offense."

The State counters that the evidence of Behrel's sexual abuse of Miller "had special relevance with regard to preparation, and to establish a common scheme or plan." Moreover, the State contends that any prejudice was cured by the court's curative instructions to the jury regarding its consideration of Miller's testimony.

Clearly, "evidence of a defendant's prior [or other] criminal acts may not be introduced to prove guilt of the offense for which the defendant is on trial." *Ayers v. State,* 335 Md. 602, 630, 645 A.2d 22 (1994), *cert. denied,* 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995); *see Borchardt v. State,* 367 Md. 91, 133, 786 A.2d 631 (2001), *cert. denied,* 535 U.S. 1104, 122 S.Ct. 2309, 152 L.Ed.2d 1064 (2002); *Carter v. State,* 366 Md. 574, 583, 785 A.2d 348 (2001); *Snyder v. State,* 361 Md. 580, 602–03, 762 A.2d 125 (2000); *State v. Faulkner,* 314 Md. 630, 633, 552 A.2d 896 (1989). Put another way, such evidence may not be introduced " 'to suggest that because the defendant is a person of criminal character, it is more probable that he committed the crime for which he is on trial.' " *Streater v. State,* 352 Md. 800, 806, 724 A.2d 111 (1999) (citation omitted). Indeed, "there are few principles of American criminal jurisprudence more universally accepted than the

rule that evidence which tends to show that the accused committed another crime independent of that for which he is on trial, even one of the same type, is inadmissible." *Cross v. State,* 282 Md. 468, 473, 386 A.2d 757 (1978).

The foregoing principles are embodied in Maryland Rule 5–404. It provides, in pertinent part:

> **(b) Other crimes, wrongs, or acts.**—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

The "other crimes" rule reflects a "fear that jurors will conclude from evidence of other bad acts that the defendant is a 'bad person' and should therefore be convicted, or deserves punishment for other bad conduct and so may be convicted even though the evidence is lacking...." *Harris v. State,* 324 Md. 490, 496, 597 A.2d 956 (1991); *see Merzbacher v. State,* 346 Md. 391, 406, 697 A.2d 432 (1997) (reiterating that the rationale for the rule is "to prevent a jury from punishing a defendant for having a 'criminal propensity' " (citation omitted)); *Terry v. State,* 332 Md. 329, 334, 631 A.2d 424 (1993) (noting the exclusion of other crimes evidence because it tends "to confuse the jurors, predispose them to a belief in the defendant's guilt, or prejudice their minds against the defendant").

 Several exceptions have been carved from the general exclusionary rule. *Carter,* 366 Md. at 583, 785 A.2d 348; *Ayers,* 335 Md. at 631–32, 645 A.2d 22. " 'Evidence of other crimes may be admitted ... if it is *substantially relevant to some contested issue* in the case and if it is not offered to prove the defendant's guilt based on propensity to commit crime or his character as a criminal.' " *Emory v. State,* 101 Md.App. 585, 602, 647 A.2d 1243 (1994), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995) (citation omitted; emphasis suppled); *see Terry,* 332 Md. at 334, 631 A.2d 424; *Wilkerson v. State,*

139 Md.App. 557, 570, 776 A.2d 685, *cert. denied,* 366 Md. 249, 783 A.2d 223 (2001). As Rule 5–404(b) indicates, evidence of "other crimes" is admissible when the evidence tends to establish motive, intent, absence of mistake, a common scheme or plan, identity, opportunity, preparation, or knowledge. *Faulkner,* 314 Md. at 634, 552 A.2d 896. But, the list of exceptions is merely a " 'representative list.' " *Merzbacher,* 346 Md. at 407, 697 A.2d 432 (citation omitted); *see Harris,* 324 Md. at 501, 597 A.2d 956.

A three-pronged test governs the admissibility of other crimes evidence. *Borchardt,* 367 Md. at 132–33 n. 7, 786 A.2d 631; *Streater,* 352 Md. at 807–08, 724 A.2d 111; *Wynn v. State,* 351 Md. 307, 317, 718 A.2d 588 (1998); *Oesby v. State,* 142 Md.App. 144, 158–59, 788 A.2d 662, *cert. denied,* 369 Md. 181, 798 A.2d 553 (2002). First, the trial court must determine if the evidence fits within one or more of the exceptions to the rule. That decision does not involve any discretion on the part of the trial court, *Faulkner,* 314 Md. at 634, 552 A.2d 896; *Oesby,* 142 Md.App. at 159, 788 A.2d 662. Therefore, no deference is extended to the trial court in regard to its determination. *Emory,* 101 Md.App. at 604, 647 A.2d 1243. Second, if the evidence fits within one of the exceptions, then the trial court must determine "whether the accused's involvement in the other crimes is established by clear and convincing evidence." *Faulkner,* 314 Md. at 634, 552 A.2d 896. Third, the trial court must carefully balance the necessity for, and probative value of, the other crimes evidence against any undue prejudice likely to result from its admission. *Id.* at 635, 552 A.2d 896. This is a discretionary determination on the part of the trial court. *Id.*

As Judge Moylan stated for the Court in *Oesby,* 142 Md. App. at 163, 788 A.2d 662: "What matters is that the evidence of the 'other crimes,' however it might be categorized or labeled, enjoyed a special or heightened relevance in helping to establish" a contested issue in the case. Here, the trial court found that Miller's testimony was relevant because it

tended to establish a common scheme or plan, or "identical earmarking of the handy work of the accused."

To be sure, a ruling on relevance is "quintessentially" within the discretion of the trial judge. *Best v. State*, 79 Md.App. 241, 259, 556 A.2d 701, *cert. denied*, 317 Md. 70, 562 A.2d 718 (1989); *see Grandison v. State*, 341 Md. 175, 206, 670 A.2d 398 (1995), *cert. denied*, 519 U.S. 1027, 117 S.Ct. 581, 136 L.Ed.2d 512 (1996), and *reh'g denied*, 519 U.S. 1143, 117 S.Ct. 1021, 136 L.Ed.2d 897 (1997); *Sutton v. State*, 139 Md.App. 412, 448, 776 A.2d 47, *cert. denied*, 366 Md. 249, 783 A.2d 223 (2001). Absent an abuse of discretion, a trial court's decision to admit relevant evidence will not be reversed. *White v. State*, 324 Md. 626, 637, 598 A.2d 187 (1991); *Hunt v. State*, 321 Md. 387, 425, 583 A.2d 218 (1990), *cert. denied*, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991); *Shemondy v. State*, 147 Md.App. 602, 612–13, 810 A.2d 36 (2002), *cert. denied*, 373 Md. 408, 818 A.2d 1106 (2003). In our view, Miller's testimony did not fit within a recognized exception for other crimes evidence, nor was it relevant to a contested issue. Therefore, we conclude that the court erred or abused its discretion in admitting Miller's testimony. We explain.

For the most part, other crimes evidence is admissible when relevant to the issue of identity. *See Oesby*, 142 Md.App. at 163, 788 A.2d 662 (stating that "a 'signature' modus operandi.... is just one particular way of proving 'identity.' "). Identity was not the issue here, however.

The State relies on *Merzbacher*, 346 Md. 391, 697 A.2d 432, to support its claim that Miller's testimony was properly admitted at the Curtis trial. *Merzbacher* is distinguishable.

There, the victim claimed that beginning in 1972, when she was eleven years old, and continuing until 1975, the defendant, a lay teacher at a parochial middle school, subjected her to sexual, physical, and emotional abuse. *Id.* at 396, 697 A.2d 432. At trial, the State offered the testimony of numerous witnesses describing various acts of alleged physical and sexual abuse for which the appellant was not on trial, and evidence of the defendant's "persistent and vicious conduct," which

"created a threatening environment [and] suggested that [the victim] had little choice but to acquiesce...." *Id.* at 411, 697 A.2d 432. The "other crimes" evidence was introduced to negate any inference of consent and to explain the victim's delay of twenty years in reporting the abusive conduct. *Id.* at 409, 697 A.2d 432. On appeal, the defendant challenged the admission of the testimony with respect to "wrongful acts" and "other crimes" involving other students. *Id.* at 406, 697 A.2d 432.

In affirming the trial court's admission of the evidence, the Court of Appeals noted "the unique circumstances of [the] case." *Id.* at 409, 697 A.2d 432. The Court recognized that "[s]uch testimony was highly relevant" to the issue of the victim's consent. *Id.* at 411, 697 A.2d 432. In the Court's view, the evidence also showed a pattern and common scheme. Moreover, the Court considered the evidence relevant to explain the victim's long delay in reporting the abuse. *Id.* at 409, 697 A.2d 432. The Court explained:

[The appellant] defended himself by attacking the credibility of [the victim], pointing to the over two decades it took for her to come to the authorities. By doing so, he forced the State into showing the jury that [the appellant's] rape took place in a larger, more invidious context. [The victim] testified, corroborated by other witnesses, that [the appellant] used a combination of frivolity and fright to run his classroom. In part, this served to explain and was particularly relevant to why [the victim], either reasonably or unreasonably, waited so long to reveal her story....

\* \* \*

... [The victim's] sexual abuse was not an isolated incident devoid of setting. It took place over the course of a three year period in a very specific relationship and highly intimidating atmosphere. The other crimes or bad acts evidence introduced against [the appellant] were not for conduct "wholly independent of that for which [the appellant] was on trial...." The jury was entitled to know the setting in which the alleged sexual misconduct took place

because, under the facts of this case, the setting and the crime were so intimately connected as to be inseparable. *Id.* at 409, 410, 697 A.2d 432 (internal citations omitted).

Unlike in *Merzbacher,* consent was not an issue here. *See* Art. 27, § 35C. Moreover, Curtis did not allege that he failed to report the crime because of a "highly intimidating atmosphere" at the School, nor did appellant impugn Curtis's veracity on that basis. Therefore, the jury had no need to know of the "setting in which the alleged sexual misconduct took place." *Id.* at 410, 697 A.2d 432. Rather, appellant attacked Curtis's credibility by denying that he (Behrel) had ever been involved in any sexual activity with Curtis.

We believe *McKinney v. State,* 82 Md.App. 111, 570 A.2d 360, *cert. denied,* 320 Md. 222, 577 A.2d 50 (1990), is more on point. Following a consolidated bench trial, the defendant, a counselor at an outdoor education program, was convicted of third degree sexual assault of three victims, in violation of Art 27, § 464(a)(3). *Id.* at 114, 115, 570 A.2d 360. The victims, all female campers, alleged that the defendant had touched their breasts, buttocks, and vaginal areas, but the defendant "consistently denied" any misconduct. *Id.* at 115, 570 A.2d 360. On appeal, the defendant claimed the trial court erred in consolidating the cases for trial. *Id.* at 114, 570 A.2d 360. We agreed and reversed.

The Court considered the "other crimes rule" and concluded that "the evidence as to each individual offense would not be mutually admissible at separate trials." *Id.* at 119, 126, 570 A.2d 360. It reasoned that the evidence did "not tend to establish" any of the exceptions to the other crimes doctrine. *Id.* at 123, 570 A.2d 360.

Significantly, the *McKinney* Court determined that "evidence of sexual contact" with each of the alleged victims did not fit within the common scheme or plan exception to the other crimes rule, because identity was not in issue. *Id.* 123, 124, 570 A.2d 360. We stated:

The common scheme or plan "exception" might mean either of two things: (1) a *modus operandi, which is but one*

*means of establishing identity* and thus would not be material in the case *sub judice,* or (2) a plan to commit one offense as part of a grand scheme to commit others, such as a theft of nitroglycerine for use in blowing open such a safe. In the latter sense, *the other crimes evidence in a separate prosecution of appellant for sexual contact with one child— evidence of similar conduct with a different child—would not be relevant because it would not tend to prove that kind of common scheme.*

*Id.* at 124, 570 A.2d 360 (emphasis added).

*Reidnauer v. State,* 133 Md.App. 311, 755 A.2d 553, *cert. denied,* 361 Md. 233, 760 A.2d 1107 (2000), is also noteworthy. There, the defendant was convicted at a consolidated bench trial of unrelated sexual offenses involving two prostitutes. We were "call[ed] upon ... to decide whether the credibility of the two victims ... as to the issue of consent, may be established by the corroborative effect of the testimony of the other." *Id.* at 314, 755 A.2d 553.

Both victims testified at the trial. One of the victims, Jones, testified that she was working as a prostitute on a street corner in Glen Burnie when the appellant solicited her to perform an act of oral sex. *Id.* at 315, 755 A.2d 553. After she agreed and got into his car, the appellant drove the victim to his place of employment. *Id.* Upon arrival, Jones requested payment in advance; appellant refused. *Id.* He also refused to allow Jones to leave, stating: " 'You are going to do this.' " *Id.* (citation omitted). Jones complied, explaining that the appellant forced her to engage in oral sex and vaginal and anal intercourse, used Vaseline while he conducted the sexual acts, and told her "that he would beat her if she did not act as if she was enjoying herself." *Id.* at 316, 755 A.2d 553. The appellant also said he had AIDS and was making sure that she contracted the virus from him. *Id.*

The other victim, McCauley, testified that the defendant solicited her for sexual acts and drove her to his place of employment, where he had also taken Jones. *Id.* Upon arrival, McCauley informed appellant of her fee. *Id.* After McCau-

ley performed, the defendant demanded intercourse and told
McCauley to remove her clothes. When she refused, the
defendant tore off her clothes and informed her that he was
HIV positive and intended to infect every prostitute working
in the area. The defendant also used Vaseline and penetrated
the victim vaginally and anally. *Id.*

This Court reversed the convictions and remanded for new
trials, concluding that the trial "judge. erred in joining two
cases involving separate victims of rape, sexual assault, and
related offenses...." *Id.* at 315, 755 A.2d 553. Writing for
the Court, Judge Davis said: "Even though the evidence
indicates that the sexual assaults committed in this case were
perpetrated in a similar manner, the similarities do not estab-
lish that the offenses were part of a common scheme." *Id.* at
321, 755 A.2d 553. The Court defined the common scheme
exception:

> "Wrongful acts planned and committed together may be
> proved in order to show a continuing plan or common
> scheme ... there must be evidence ... of one grand plan;
> the commission of each is merely a step toward the realiza-
> tion of that goal. The fact that the crimes are similar to
> each other or occurred close in time to each other is
> insufficient."

*Id.* at 322, 755 A.2d 553 (quoting *Emory v. State*, 101 Md.App.
585, 623, 647 A.2d 1243 (1994))(text and citations omitted in
*Reidnauer* ).

As we see it, this case fits within the principles set forth in
*McKinney* and *Reidnauer.* As we have stated, neither identi-
ty of the assailant nor consent of the victims was in issue, so
that Miller's testimony was not relevant as to those matters.
Moreover, evidence that appellant's conduct with Miller was
similar to his conduct with Curtis was not relevant to prove "a
plan to commit one offense as part of a grand scheme to
commit others." *McKinney*, 82 Md.App. at 124, 570 A.2d 360;
*see Reidnauer*, 133 Md.App. at 321–23, 755 A.2d 553.

The central issue here was whether the abuse occurred at
all, and the strength of the State's case rested largely on the

jury's assessment of Curtis's credibility and Behrel's veracity. The State clearly sought to enhance Curtis's credibility as to what occurred through the use of Miller's testimony, notwithstanding its characterization of Miller's testimony as probative of a common scheme or plan by appellant. Miller's testimony strengthened the State's case because the testimony suggested that, if appellant abused Miller, then he also must have abused Curtis. In other words, Miller's testimony was used to show that appellant had a propensity to commit the abuse, which is a classically improper use of "other crimes" evidence. Indeed, it is fundamental that evidence of a defendant's conduct in one crime is not admissible to prove he committed another crime.

Certainly, there were similarities in the circumstances of the victims, as the State contended. For example, as the State noted, appellant pursued students who were new to the School, and who were emotionally needy and vulnerable because of personal difficulties at home. The State also suggested that appellant endeavored to gain the trust of these students by encouraging their involvement in church-related activities at School, where they became members of a select group that had close contact with appellant. But, this did not mean that Miller's testimony fit within the common scheme or plan exception to the rule barring "other crimes" evidence.

To be sure, on the basis of Curtis's testimony, the evidence was sufficient to convict, *if* the jury believed Curtis's account. Therefore, Miller's testimony was an important vehicle that, directly or indirectly, helped to influence the jury's assessment of Curtis's credibility. Although the court had bifurcated the Miller and Curtis trials, the use of Miller's testimony at Curtis's trial amounted to an end run around the bifurcation order.

Alternatively, the State argues that any prejudice from the error was cured by the jury instructions. We are not convinced, beyond a reasonable doubt. Clearly, " 'there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure

so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.'" *Rainville v. State*, 328 Md. 398, 411, 614 A.2d 949 (1992) (quoting *Bruton v. U.S.*, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)). Clearly, Miller's testimony buttressed Curtis's account of abuse. In light of Miller's testimony, the jury may well have found it difficult to reject Curtis's version of events even though Behrel flatly contradicted Curtis's account.

For the foregoing reasons, we conclude that the trial court erred in admitting Miller's "other crimes" testimony at the Curtis trial. Therefore, we shall vacate the conviction in the Curtis trial and remand for further proceedings.

## B. THE MILLER TRIAL

### 1. Factual Summary[12]

Miller was born on April 4, 1966; he was thirty-six years old at the time of trial. He transferred to SJS in the fall of 1981, during the tenth grade. When Miller became an acolyte, he assisted Behrel "in religious ceremonies or prayers." Later, appellant "selected" Miller to serve as a sacristan.

Miller testified that, during his first year at SJS, his parents "were separating and going through a divorce," and he often discussed the situation with appellant. He also recalled that he and other students regularly watched television in appellant's campus apartment. Miller identified the footlocker recovered in the search of appellant's residence in Illinois as "the same trunk" that appellant had in his campus apartment, in which he stored pornographic magazines.

According to Miller, appellant "continued to impress" upon him" that being " 'one of [Behrel's] favorites' " was a status that "entail[ed], you know, doing things of which I had no idea what he meant." Moreover, appellant told Miller that if he "didn't continue, uh, things would be taken away." Miller

---

12. To the extent that Miller's testimony at the Miller trial was consistent with his testimony at the Curtis trial, we need not repeat it here. Instead, we shall focus on additional testimony provided by Miller.

interpreted the comment to mean that he would be "stripped of being a sacristan."

Miller recalled that appellant began to abuse him sexually "sometime during [his] first semester" at SJS, when he was fifteen years old. It was Miller's first sexual experience. The abuse progressed to sodomy "some time in the second semester of [Miller's] tenth grade year," which would "happen on a regular basis." Because of Miller's sexual involvement with Behrel, Miller received "special benefits"; he was allowed to "stay up later than everyone else" and was "served alcohol and drugs[.]"

Miller testified that he was seriously injured during eleventh grade, when he "fell off a cliff" while "backpacking with a friend." As a result of his injuries, he returned to school after a hospital stay with "a body cast and an arm cast"; he had broken both arms, his back, and his leg. Nevertheless, the abuse by appellant continued, despite Miller's "protest." The following testimony is pertinent:

[STATE]: What happened, Jeff?

[MILLER]: I had broken my back and, uh, continually trying to find ways not to partake in that activity, I said that it would ... hurt me, hurt my back, and uh, he continued to force himself on me.

[STATE]: Was there a particular term that he used for the activity that took place while you were in the cast?

\* \* \*

[MILLER]: He referred to the position as "walking on the ceiling."

[STATE]: And what position is that?

[MILLER]: It's, uh, when you're laying on your back and your feet are in the air.

[STATE]: And anal intercourse, in that position?

[MILLER]: Yes.

The State introduced pages from Miller's SJS senior yearbook. One of the pages contained appellant's handwritten inscription. It said, in pertinent part:

Kung Pao ... Now who are you calling! ... hydrocolator ... Lake Michigan Ferry....Rose ... slolum [sic] skiing in the upper Penninsula ... Gyoza(jyros?) ... Neo's ..."Arthur"... "Jeffrey...shut up!"... *body cast sponge bath ... elance ... footrub ..."I know you're keeping a little on the side for me."*... "PerhapsLove," Placido Domingo....Djarumtins ... stud bolt ... Europe '84–'85–'86? ... *walking on ceilings....* Saturday tire-changing ... left side bigger than right ... Friday night movies ... stud-bolt ... Tera....Loyola ... Chicago '82–'83 ... Jeff intros watermelon shooters to Chi-town ... Gottfried Muller ... driving tickets ... catalog ordering ... *drinks in French canning jar glasses* ... F.Bs glass pipe.... *Jeff's number of help & salvation (301) 790–0871* ... late night "Twilight Zone"... Water Tower Place....Ralph Lauren.... "It's a little too bright in here, for me"... Jeffrey ... get off the phone ... black eyes ... *A friendship started in October 1981 is forever....*

(Emphasis added).

As to the inscription, the following testimony is pertinent:

[STATE]: Tell the ladies and gentlemen what ... that [yearbook inscription] means to you please.

[MILLER]: Well, it's a ..., it's a number of numerous phrases about different things.

[STATE]: Did any of these entries pertain to your sexual relationship with the defendant?

[MILLER]: Yes.

[STATE]: What?

[MILLER]: Uh, halfway down is ...., the words "walking on ceilings[,]" um, above that's, "I know you're keeping a little on the side for me[.]"

[STATE]: What does that mean?

[MILLER]: Uh, I would go home on weekends, and I had girlfriends at home, and I believe it was a reference to the

sexual activity that was left . . ., or that I would be exposed to at school.

\* \* \*

[MILLER]: Um, "drinks in french canning jars" refers to . . . ., or "french canning jar glasses" refers to alcohol consumption.

[STATE]: Is that what you'd be served?

[MILLER]: Out of those glasses.

[STATE]: By the defendant?

[MILLER]: Correct. Or I would serve myself out of his cabinet. "FB's glass pipe" refers to a marijuana pipe that Father Behrel had.

[STATE]: Does "FB" mean Father Behrel?

[MILLER]: Yes. Um, there's another phrase right after that, that says, "Jeff's number of help and salvation", his phone number.

[STATE]: You mean Father Behrel's phone number?

[MILLER]: Yes. And he references here a . . ., "a friendship that started in October of 1981 is forever", just a number of things in here that are references to all of that.

[STATE]: Jeff, is there a specific reference to the body cast?

[MILLER]: Yes, towards the top.

[STATE]: What does it say?

[MILLER]: It says, "body cast sponge bath[.]"

[STATE]: What does that mean?

[MILLER]: He would have washed me down in a body cast. In an arm cast I couldn't do it myself, so he referenced doing it for me.

[STATE]: He did that?

[MILLER]: Yes.

Miller also mentioned the reference in the yearbook about "foot rubs." He testified that his sexual relationship with appellant began with foot rubs.

When Miller was asked why he came forward with the allegations of abuse, the following transpired:

[STATE]: Now, Jeff, it's true that ..., that you were reluctant to become involved in this case, is that correct?

[MILLER]: Yes.

[STATE]: Why?

[MILLER]: That's a pretty good question. Uh, something I put behind me, never thought about, never wanted to think about it, and I thought I had done a pretty good job about that. Uh, thinking about it is something I didn't want to do.

[STATE]: Why have you decided to come forward now, Jeff?

[MILLER]: *I came forward because I was unfortunately naive enough to think that it began and ended with me. When I found out ..., when the police officer contacted me that ...* [13]

[APPELLANT'S COUNSEL]: *Objection, Your Honor.*

THE COURT: *Sustained, sustained.*

[STATE]: Just talk about what happened to you ok?

[MILLER]: Why did I get involved is the question?

[STATE]: Uh hum.

[MILLER]: Because it became ..., *I became aware that it happened to somebody else,* and that's the. . . .

[APPELLANT'S COUNSEL]: *Objection, Your Honor. May we approach the Bench?*

(Emphasis added.)

At the bench, appellant moved for a mistrial. The following discussion ensued:

[APPELLANT'S COUNSEL]: The State knew our position with regard to prior bad acts and apparently did not counsel the witnesses. Unfortunately now we have a statement by this witness saying, you know, that it happened another

---

13. The ellipsis appears in the original transcript.

time, but the jury . . . . (inaudible) . . . ., *at this time I would make a Motion for a Mistrial.*

[STATE]: Your Honor, I think it's pretty apparent that I did not solicit this. I asked him why he came forward. The testimony was that he was very reluctant to come forward.

Thereafter, the court held a hearing as to the mistrial motion. The following colloquy is relevant:

[APPELLANT'S COUNSEL]: . . . When [Miller] was asked why he was coming forward and started to say, "Well I, you know, I heard things or something[,]" I stood up and objected, that was sustained, and then he was admonished by [the State], "well just talk about what's happened to. you[,]" and then he blurts out, "well, I heard that he had done it to other people[.]" I think that's not only inadmissible, it's highly prejudicial, and I think it's a statement that we can't get . . ., you can't get . . ., it's not one of those statements, "well just ignore that[.]" I think it's . . ., I don't think my client can get a fair trial under that basis and for that reason I would renew that Motion for Mistrial.

[THE STATE]: Your Honor, I just want to say a couple of things. First of all, I certainly did not solicit this comment from Mr. Miller. In my previous dealings with Mr. Miller all throughout the investigation of this case, when we discussed his obvious reluctance and his real wavering on whether to even cooperate in this case at all, he always indicated to me that his reasons for coming forward were two-fold that he didn't want this type of abuse to happen to someone else and also because he had an obligation to his children, and certainly that was the . . ., that was the flavor of the response that I anticipated coming from Mr. Miller. I certainly would not have elicited something that I knew obviously would be prejudicial. The Court must find that the statement is clear and egregious prejudice to the defendant, and I do understand, Your Honor, that certainly if the Court feels that a curative instruction is not applicable in this case, that a mistrial should be granted.

Although the court agreed that Miller's statement was "prejudicial," it denied the motion. The court reasoned:

[W]e're dealing with a case that relates to the offense and it concerns the victim, who is Mr. Miller in this case, Jeff Miller. The comments occurred during a period of time when Mr. Miller was obviously emotionally distraught, almost in tears when he was testifying about the events that occurred, and there *was an objection, I think, before the actual ..., an actual statement as to having heard about prior victims. That was sustained, and once again, before any comments came out,* and then there was an objection immediately upon Mr. Miller saying words to the effect that he decided to reveal what happened to him because he had heard about others being subjected to abuse. That was objected to immediately, and the Court sustained the objection, and there was a Motion for Mistrial. There is prejudice, but the question is whether the prejudice at this time can be cured by an instruction, and the Court has to exercise its discretion in a situation like this.

Mindful of the danger of exacerbating the prejudice with a curative instruction highlighting the inadmissible evidence, the court said:

The Court is going to attempt, therefore, to give a curative instruction that will tell the jury that they are not to consider in any way any inadmissible or improper statements of Mr. Miller concerning any allegations of other incidences other than that which Mr. Miller testified concerning himself. So I'm going to deny the Motion for Mistrial and give a curative instruction. But hopefully, it will not happen again.

In reaching that result, the court expressly considered "the quality of the jurors" and their "ability," based on information gleaned during the *voir dire* examination, "to put aside any personal prejudices or biases as they have stated to this Court...." Thereafter, the court propounded the following curative instruction to the jury:

Ladies and gentlemen of the jury, before we broke [for lunch], the Court sustained objections to certain testimony of Mr. Miller. I want to instruct you that the court has stricken the testimony of Mr. Miller as it relates only to any comments concerning other incidences other than that which he testified related to himself. The Court instructs you that you are not to consider any inadmissible or stricken evidence during any deliberation or for any reason whatsoever. So I instruct you that there has been evidence and testimony stricken and that you're not to consider it for any purpose whatsoever.

Prior to the commencement of the Miller trial, appellant had filed a motion in limine, seeking to exclude testimony from Curtis concerning "other crimes." The State agreed not to introduce evidence concerning the abuse of Curtis at the Miller trial. Accordingly, Curtis testified briefly at the Miller trial, without disclosing that he had been sexually abused by appellant.

Curtis stated that, although he and Miller served as sacristans and played on the football and lacrosse teams together, "[they] weren't really friends." Nevertheless, he explained that "the school is very small, a hundred and twenty (120) students, so [he] knew Jeff, but [they] didn't associate." Curtis claimed, however, that appellant had disclosed information to him regarding appellant's relationship with Miller. Curtis said: "[Father Behrel] told me that he could make Jeff cum [14] without touching him in having sex in a certain position."

Appellant testified in his own defense and denied having "a sexual relationship" or "any sexual contact" with Miller. In regard to appellant's interpretation of what he wrote in Miller's yearbook, the following exchange is noteworthy:

[APPELLANT'S COUNSEL]: Alright, "walking on the ceilings[,]" did that . . ., did that apply to having anal sex with Mr. Miller in a body cast?

---

**14.** In *Webster's Unabridged Dictionary* 409, 488 (2d ed.2001), "Cum" is defined as slang for semen.

[APPELLANT]: Well that was one of his expressions, um, and he had many different expressions, um, beyond "walking on ceilings[.]" I wouldn't want to sign my name to it, um, because they were too graphic. Um, this [is] all coming from, you know, his girlfriends that were listed and, uh, you know, "stud bolt" and uh, uh, . . . .

[APPELLANT'S COUNSEL]: "Save a piece on the side for me[?]"

[APPELLANT]: Jeff, yeah, I mean. . . ., I don't know what that means, um, but here too, "Jeff introduces water melon shooters[,]" that was something . . ., a big thing in Georgetown. Um, and of course on his own page, I mean there's various references along with mine that he would drive into Georgetown without a license and with his girlfriends and. . . .

\* \* \*

[APPELLANT'S ATTORNEY]: So there was nothing of a sexual nature that you've written in the yearbook referring to any sexual contact you had with Mr. Miller?

[APPELLANT]: No. . . .

\* \* \*

[STATE]: Did you write "FB's glass pipe[?]"

[APPELLANT]: Uh hum.

[STATE]: What did that mean?

[APPELLANT]: Well he had several, um marijuana pipes, uh, one was, um, um, wood and metal, uh, and these were actually the things I put in the trunk when he'd bring them to school because I didn't want him to have it on campus, and the glass one had a very fancy, well I guess marijuana leaf on it, um and I always said that that was..., I thought that pipe was prettier than the other one, so that's why . . ., I mean who would have thought that this was going to come out twenty years later when it was just a joke.

\* \* \*

[STATE]: So what you're saying is that "FB's glass pipe" does not mean Father Behrel's glass pipe?

[APPELLANT]: No.

In its instructions to the jury, the court admonished the jurors that "[i]nadmissible or stricken evidence must not be considered or used by you ... If after an answer was given I ruled that the answer should be stricken, you must disregard both the question and the answer in your deliberations."

## 2. Discussion

 Appellant contends that the court erred in denying his motion for mistrial after Miller's comment as to why he came forward. According to appellant, "[w]ith credibility such a key issue at trial, [appellant] believes the prejudicial statement which was blurted out by Miller could not be erased in the jury's mind by a curative instruction after the lunch break."

The State responds that "Behrel was not prejudiced and the trial court did not abuse its discretion in denying his motion for a mistrial." It contends that "[t]hough Jeff Miller was certainly the principal witness in the case, ... a good deal of other evidence existed to corroborate his account." Moreover, it maintains that any possible prejudice from Miller's statement was "neutralized" by the court's curative instruction.

 In *Klauenberg v. State,* 355 Md. 528, 555, 735 A.2d 1061 (1999), the Court recognized that the decision as to whether to grant a mistrial lies within the sound discretion of the trial court. *See also Walker v. State,* 373 Md. 360, 818 A.2d 1078 (2003); *Carter, supra,* 366 Md. at 589, 785 A.2d 348. Therefore, our task is to decide whether the trial court abused its discretion in denying the mistrial motion.

In *Hunt, supra,* 321 Md. at 422, 583 A.2d 218, the Court explained:

"The declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice." This Court has recognized that granting a motion for a mistrial lies within the discretion of the trial judge. The trial judge, who hears the entire case and can weigh the danger of prejudice arising from improper testimony is in

the best position to determine if the extraordinary remedy of a mistrial is appropriate. We will not reverse a trial court's denial of a motion for mistrial unless the defendant was so clearly prejudiced that the denial constituted an abuse of discretion.

(Internal citations omitted).

Whether a mistrial is warranted hinges upon the question of prejudice to the defendant. *Rainville, supra,* 328 Md. at 408, 614 A.2d 949; *State v. Hawkins,* 326 Md. 270, 276, 604 A.2d 489 (1992). As Judge Moylan said for the Court in *Burks v. State,* 96 Md.App. 173, 187, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993): "A mistrial is not a sanction designed to punish an attorney for an impropriety. It is rather an extreme sanction that sometimes must be resorted to when such overwhelming prejudice has occurred that no other remedy will suffice to cure the prejudice." Noting that the purpose of a mistrial is remedial, not "prophylactic," *id.* at 189, 624 A.2d 1257, the *Burks* Court added: "[T]he decision as to whether a mistrial is called for is contingent upon the impact of an error and not upon the motivation behind the error." *Id.* at 188, 624 A.2d 1257. Moreover, the remarks must be "a direct and contributing factor" that resulted in "egregious prejudice" to the defendant. *Leak v. State,* 84 Md.App. 353, 358, 579 A.2d 788 (1990).

In *Guesfeird v. State,* 300 Md. 653, 480 A.2d 800 (1984), the Court identified several factors relevant to the evaluation of the prejudicial effect of improper testimony. The factors include

whether the reference to [inadmissible evidence] was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; [and] whether a great deal of other evidence exists. . . .

*Id.* at 659, 480 A.2d 800. Nevertheless, the *Guesfeird* "factors are not exclusive and do not themselves comprise the test" for determining whether the defendant received a fair trial. *Kosmas v. State,* 316 Md. 587, 594, 560 A.2d 1137 (1989).

The remarks at issue in *Guesfeird* concerned references to a lie detector test. The Court applied the same factors in *Rainville* to "a different kind of inadmissible and prejudicial testimony." *Rainville,* 328 Md. at 408, 614 A.2d 949; *see also Coffey v. State,* 100 Md.App. 587, 598–600, 642 A.2d 276 (1994)(applying the factors to an officer's statement that the defendant was found guilty at an earlier trial.) In *Rainville,* the disputed testimony involved a mother's statement that the defendant, who was charged with the sexual abuse of her seven-year-old daughter, had been "in jail for what he had done" to her nine-year-old son. 328 Md. at 407, 614 A.2d 949. The State's case in *Rainville* rested heavily on the credibility of the child victim's testimony. *Id.* at 409–410, 614 A.2d 949. The *Rainville* Court concluded that the mother's remark was "particularly prejudicial because the defendant had not been convicted of any sexual offense...." *Id.* at 407, 614 A.2d 949.

*Kosmas, supra,* 316 Md. 587, 560 A.2d 1137, is also instructive. There, the defendant was accused of murdering his wife. At trial, the defendant adamantly denied any involvement in the crime. *Id.* at 590–91, 560 A.2d 1137. Although the State offered testimony that the defendant had declined to take a lie detector test, the court denied the mistrial motion, relying instead on a curative instruction. *Id.* at 591–92, 560 A.2d 1137. The Court reversed the murder conviction. It recognized that the reference was isolated, and noted that the question as to the State's fault made "no difference in [the] ultimate determination of prejudice...." *Id.* at 595, 560 A.2d 1137. But, applying the *Guesfeird* factors, the Court considered the weight of the other evidence against the defendant, *id.* at 596–98, 560 A.2d 1137, and said:

More important, however, are the questions of whether credibility of the defendant was a crucial issue in the case, and whether the strength of the State's case was otherwise such that the prejudice resulting from the improper admis-

sion of the evidence may be considered insubstantial. On the first issue, it is clear that the defendant's credibility was critical to the success of his case. Much of the strength of the State's circumstantial evidence case depended upon the jury believing that the defendant had repeatedly threatened and abused his wife, and had attempted to contract for her murder. The defendant adamantly denied the truth of those allegations. Informing the jury that the defendant had refused to take a lie detector test cut to the heart of the defense....

\* \* \*

... Overall it is fair to say that if [two of the testifying witnesses] are believed, the State has a strong circumstantial evidence case, but even then it is not overwhelming. If the defendant is believed in those areas in which his testimony conflicts with that of [those witnesses], the State's case is very weak. *Again, then, it is apparent that the issue of the defendant's credibility is a central and crucial factor in this case, and the State's evidence that does not hinge at least in part upon the determination of that credibility is hardly of sufficient strength to permit us to find beyond a reasonable doubt that the inadmissible evidence did not in any way influence the verdict.*

(Emphasis added).

Applying the principles of the above-cited cases here, it is significant that Miller never expressly said that appellant sexually abused another student at SJS. Rather, Miller said: 1) "I came forward because I was unfortunately naive enough to think that it began and ended with me;" and 2) "I became aware that it happened to somebody else...." Thus, Miller's remarks about so-called "other crimes" did not directly implicate appellant; the rather vague comments could have been interpreted by the jury as reflective of Miller's general awareness of the increased reporting of sexual abuse committed by clergy.

Moreover, the court gave a curative instruction, which was essentially repeated during the final jury instructions. And,

appellant did not quarrel with the prosecutor's assertion that she did not deliberately solicit the comments.[15] Indeed, the transcript reflects that the State specifically instructed Miller to speak only about events that happened to him, and the State expressed surprise as to Miller's answer.

In weighing the strength of the State's case as part of a mistrial determination, evidence that depends for its value on a determination of credibility does not weigh heavily in the State's favor. *See Rainville,* 328 Md. at 411, 614 A.2d 949. The Court has reversed the denial of a mistrial motion when " 'the State's evidence that does not hinge at least in part upon the determination of [the defendant's] credibility is hardly of sufficient strength to permit us to find beyond a reasonable doubt that the inadmissible evidence did not in any way influence the verdict.' " *Rainville,* 328 Md. at 411, 614 A.2d 949 (citation omitted). Appellant urges us to hold that this case fits squarely within that principle.

This is not a case in which the State relied only on Miller's testimony to prove its case. Curtis testified to a damaging admission by appellant; appellant told Curtis that "he (i.e., appellant) could make Jeff cum without touching him by having sex in a certain position." Additionally, a portion of Miller's yearbook was admitted in evidence, which contained appellant's handwritten inscription, supportive of Miller's testimony. Furthermore, the footlocker that Miller described as the coffee table in appellant's apartment was admitted in evidence. Additionally, it contained a pornographic magazine, also admitted in evidence; the magazine included a reference to the year 1982.

Without question, credibility was crucial to each side's position. Miller asserted that appellant sexually abused him, and appellant flatly denied Miller's charge. Yet, the State pre-

15. Appellant concedes that "the State may not have been seeking this particular response...." But, he contends that "it should have been clear from [Miller's] previous response ... that [he] was coming dangerously close to blurting out an inadmissible comment" and "[n]evertheless the State continued to pursue that line of questioning."

sented ample evidence independent of Miller's credibility. That evidence, coupled with the curative instruction and the jury instruction, leads us to conclude that the court below did not abuse its discretion in denying the motion for mistrial. *See Walker, supra,* slip op. at 14; *see Lai v. Sagle,* 373 Md. 306, 818 A.2d 237 (2003).

■■■ " '[T]he grant of a mistrial is considered an extraordinary remedy and should be granted only "if necessary to serve the ends of justice." ' " *Carter,* 366 Md. at 589, 785 A.2d 348 (citations omitted). A mistrial was not required here to serve the ends of justice.

JUDGMENT OF CONVICTION IN THE MILLER TRIAL (CASE NO. 750) AFFIRMED; JUDGMENT OF CONVICTION IN THE CURTIS TRIAL (CASE NO. 751) VACATED AND REMANDED TO THE CIRCUIT COURT FOR WASHINGTON COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID HALF BY APPELLANT AND HALF BY WASHINGTON COUNTY.